# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2022-2966
LT Case No. 2019-CF-001352

_____

MICHAEL CRIST,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____

On appeal from the Circuit Court for Sumter County.
Mary P. Hatcher, Judge.

Matthew J. Metz, Public Defender, and Jane Almy, Assistant
Public Defender, Daytona Beach, for Appellant.

Harvey J. Sepler, Hollywood, amicus curiae, in support of
Appellant.

James Uthmeier, Attorney General, Tallahassee, and Richard A.
Pallas, Jr., Assistant Attorney General, Daytona Beach, and
Jeffrey Paul DeSousa, Acting Solicitor General, Nathan A.
Forrester, Chief Deputy Solicitor General, and Christopher J.
Baum, Senior Deputy Solicitor General, Tallahassee, for
Appellee.

August 15, 2025

**ON REHEARING EN BANC**

PRATT, J.

Florida law requires that Michael Crist's driver license state a truth about his criminal history: he is a "SEXUAL PREDATOR." § 322.141(3)(a), Fla. Stat. (2019). Florida law also prohibits Crist from possessing a driver license "upon which the sexual predator . . . marking[ ]" is "not displayed" or has "been altered." *Id.* § 322.212(5)(c). Crist stands convicted of violating this latter statute, but he urges us to overturn his conviction on the ground that his marked driver license compels him to speak in violation of the First Amendment.[1] After careful study of relevant historical practices, the United States Supreme Court's compelled-speech jurisprudence, and lower-court decisions applying that jurisprudence, we reject Crist's constitutional claim and affirm his conviction.

**I.**

Like at least seven other states,[2] and like the federal government does with U.S. passports,[3] Florida requires that a

---

[1] More precisely, Crist claims a violation of the Fourteenth Amendment, which makes the First Amendment's freedom-of-speech guarantee applicable against the States. *See Stromberg v. California*, 283 U.S. 359, 368 (1931); *Gitlow v. New York*, 268 U.S. 652, 666 (1925). This opinion will refer to the "First Amendment" as a shorthand.

[2] Kansas, Mississippi, and Oklahoma require descriptive phrases. Kan. Stat. Ann. § 8-1325a(b) (2006); Miss. Code Ann. § 45-35-3(2) (West 2020); Okla. Stat. tit. 47, § 6-111.E.1. (2025). Alabama, Delaware, Tennessee, and West Virginia require codes, at minimum. Ala. Code § 15-20A-18(c) (2017); Del. Code. Ann. tit. 21, § 2718(e) (West 2025); Tenn. Code Ann. § 55-50-353(a) (West 2022); W. Va. Code Ann. § 17B-2-3(b) (West 2006). At one time, Louisiana would have made our list; it enforced its descriptive-phrase statute until its supreme court rendered an adverse decision. *See State v. Hill*, 341 So. 3d 539 (La. 2020).

[3] The federal identifier is even more descriptive than Florida's. "The identifier is a statement printed inside the passport book

special marking appear on the driver licenses and identification cards that the State issues to persons with a history of certain sex offenses. For sexual offenders, licenses and cards must bear the marking, "943.0435, F.S."—a reference to Florida's sexual-offender registration statute. *See* §§ 322.141(3)(b), 943.0435, Fla. Stat. For sexual predators, the licenses and cards must bear the marking, "SEXUAL PREDATOR." *See id.* § 322.141(3)(a). Sexual predators are sexual offenders whose sex crimes involve repeat offenses, violence, or crimes against minors. *Id.* § 775.21(3)(a). They are subject to enhanced registration, public notification, and address verification. *Id.* § 775.21(6)–(8), (10).

The facts of this case are undisputed. By virtue of his criminal history, Crist is a sexual predator. After his 2008 release from prison, Crist resided in Sumter County and began serving seventeen years of supervised release. The Florida Department of Highway Safety and Motor Vehicles issued him a driver license bearing the required sexual predator marking.

During a sexual predator registration check in 2019, a law enforcement officer asked Crist to present his identification. Crist removed his driver license from his wallet, hesitated, and appeared to pick at it with his fingers. Based on his prior experience, the officer suspected that Crist was removing a sticker covering his sexual predator designation. The officer demanded that he immediately stop picking at the license and surrender it. When Crist continued to hesitate, the officer grasped the license and confirmed his suspicions: it bore a smiley-face emoji sticker covering the designation.

The State charged Crist with possessing a driver license upon which the required sexual predator marking was not displayed or

which reads: 'The bearer was convicted of a sex offense against a minor, and is a covered sex offender pursuant to 22 USC 212b(c)(1).'" *Passports and International Megan's Law*, U.S. Department of State, Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/passports/legal-matters/passports-and-international-megans-law.html (Apr. 8, 2025); *see* 22 U.S.C. § 212b.

3

had been altered, as well as with evidence-tampering (for attempting to remove the sticker). Crist moved the trial court to declare unconstitutional as applied to his prosecution sections 322.141(3)(a) and 322.212(5)(c)—the marked-license requirement for sexual predators. Relying on a recent Alabama federal court decision and a recent Louisiana Supreme Court decision, Crist argued that the marked-license requirement compels him to speak in violation of the First Amendment.[4] The trial court denied the motion, and Crist pleaded no contest, reserving his right to appeal the court's denial of his motion. Crist appealed, a divided panel of our court reversed, and on our own initiative, we ordered rehearing *en banc*.

## II.

Before turning to the merits, we examine the proper scope of this appeal. In its brief to the panel, the State contested jurisdiction, arguing that the order that Crist reserved for appeal is not dispositive. *See* Fla. R. App. P. 9.140(b)(2)(A)(i). Before the *en banc* court, however, the State does not repeat this argument.

We conclude that we have jurisdiction. The dispositiveness requirement that Rule 9.140 codifies—found in section 924.051(4), and repeated in section 924.06(3), Florida Statutes (2022)—"is not a limitation on the subject matter jurisdiction of the appellate courts, but instead is a codification of the existing law regarding the issues that can be addressed on appeal following a plea of guilty." *Leonard v. State*, 760 So. 2d 114, 118 (Fla. 2000); *see Ruilova v. State*, 125 So. 3d 991, 995 (Fla. 2d DCA 2013) ("[A]fter *Leonard* it is clear that the appellate court has 'jurisdiction,' i.e., power to examine the case as a whole, even when an order of suppression is not necessarily dispositive."); *accord Schaefer v. State*, 343 So. 3d 1216, 1217 (Fla. 5th DCA 2022) (following *Leonard* and affirming, rather than dismissing for lack of jurisdiction, where the defendant did not reserve a dispositive ruling). Indeed, were dispositiveness jurisdictional, then parties' stipulations would not be binding. *But see Churchill v. State*, 219

---

[4] Crist also asserted a claim under the Florida Constitution, but he presses only his federal constitutional claim on appeal.

So. 3d 14, 17–18 (Fla. 2017) (holding that appellate courts must accept a stipulation of dispositiveness).

We also conclude that the order denying Crist's motion to suppress is dispositive and, therefore, within the proper scope of Crist's appeal. "An issue is legally dispositive" when "it is clear that regardless of whether the appellate court affirms or reverses the trial court's decision, there will be no trial." *Jones v. State*, 806 So. 2d 590, 592 (Fla. 5th DCA 2002). No matter how we rule on the constitutional question, there will be no trial on the altered-license count. *See Churchill*, 219 So. 3d at 16 (identifying "rulings on '[m]otions testing . . . the constitutionality of a controlling statute'" as quintessential dispositive orders (quoting *Brown v. State*, 376 So. 2d 382, 385 (Fla. 1979))). And because Crist entered an open plea, there likewise will be no trial on the evidence-tampering count. *See Pass v. State*, 922 So. 2d 279, 282 (Fla. 2d DCA 2006) (refusing to set aside open plea on remand, and distinguishing *Jordan v. State*, 801 So. 2d 1032, 1036 (Fla. 5th DCA 2001), which concerned a negotiated plea); *Harper v. State*, 889 So. 2d 899, 900 (Fla. 2d DCA 2004) (reversal after open plea will be remanded only for resentencing, whereas reversal after negotiated plea will be remanded either for resentencing or withdrawal from plea agreement and trial). Therefore, the order on appeal is dispositive of both of Crist's charges.[5]

---

[5] Because we conclude that there will be no trial on either count, we need not and do not decide whether Rule 9.140 requires an order to be dispositive of all counts. Some decisions have suggested the order need not be dispositive of all counts, but we leave the issue for a future case. *See Hicks v. State*, 852 So. 2d 954, 961 (Fla. 5th DCA 2003) (reversing the denial of a motion to suppress that was dispositive of only one charge, and remanding for further proceedings on all charges); *accord Brown v. State*, 224 So. 3d 806, 808, 811 (Fla. 2d DCA 2017) (relying on *Hicks* to decide an appeal where the motion to suppress was dispositive of only one count); *Nelson v. State*, 268 So. 3d 837, 839 (Fla. 2d DCA 2019) (relying on *Brown*).

# III.

Now on to the merits. Although Crist challenges only the sexual predator marking on his driver license, his claim turns on the proposition that government-issued identification cards compel their holders to speak their contents. As best we can tell, that claim is quite novel, with only a handful of courts having confronted it. Those courts asked the same two questions: whether factual, personal information on government-issued identification is government or private speech, and whether it compels the identification-holder's speech. They agreed on the answer to the first question but divided over the answer to the second.

Federal district courts in Alabama and Louisiana, as well as the Louisiana Supreme Court, have accepted compelled-speech claims much like Crist's. *See Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1324–27 (M.D. Ala. 2019) (holding that Alabama's marked-identification requirement for sex offenders is government speech but nonetheless unconstitutionally compels private speech); *State v. Hill*, 341 So. 3d 539, 552, 555 (La. 2020) (holding likewise as to Louisiana's marked-identification requirement); *see also Nelson v. Landry*, 714 F. Supp. 3d 790, 808–09 (M.D. La. 2024) (relying on *Hill* to hold likewise as to Louisiana's marked driver license requirement).

The U.S. Court of Appeals for the Eleventh Circuit, on the other hand, rejected a materially similar compelled-speech claim against sex designations on driver licenses. *See Corbitt v. Sec'y of the Ala. L. Enf't Ag.*, 115 F.4th 1335, 1352–53 (11th Cir. 2024) (holding that any speech on a driver license is government speech and that male and female designations do not compel license-holders to communicate the State's message about their sex). In addition, a California federal district court rejected a compelled-speech claim much like Crist's when it upheld the identifier that federal law requires to appear on sex offenders' U.S. passports. *See Doe v. Kerry*, No. 16-CV-0654-PJH, 2016 WL 5339804, at *18 (N.D. Cal. Sept. 23, 2016) (concluding that the plaintiffs failed to state a claim because the sex-offender identifier is government speech and does not compel the passport-holder's speech).

6

In short, Crist raises an emergent issue that surfaced less than a decade ago, and on which the few courts to reach it have split. Therefore, we must take a side in a new and unfolding debate. Because we face a matter of first impression within our district with no directly on-point decision from either of our reviewing courts, we undertake our own analysis below. And because Crist asks us to opine on a matter of federal constitutional interpretation, we conduct that analysis *de novo. Henry v. State*, 175 So. 3d 675, 676–77 (Fla. 2015).

## IV.

First things first: methodology. Before the panel, the parties built their arguments solely on contemporary First Amendment doctrine. This doctrine-driven approach to a novel constitutional issue skipped over a critical first step that the U.S. Supreme Court often employs: surveying our Nation's history and tradition. *See Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (looking first to historical practices, and then to precedent, to resolve a novel First Amendment claim, noting that "[w]hat history suggests, we believe our contemporary doctrine confirms").

As the Court unanimously has explained in analyzing a novel First Amendment claim, "[w]hen faced with a dispute about the Constitution's meaning or application, '[l]ong settled and established practice is a consideration of great weight.'" *Id.* at 474 (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). This is because "'a regular course of practice' can illuminate or 'liquidate' our founding document's 'terms & phrases.'" *Id.* (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819), in 8 *Writings of James Madison* 450 (Gaillard Hunt ed., 1908)). These observations by a unanimous Court are not new; they boast a lineage extending all the way back to Chief Justice Marshall and the Framers. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819) (noting Congress's power to establish a national bank "can scarcely be considered as an open question, entirely unprejudiced by the former proceedings of the nation respecting it"; Congress's prior acts had yielded "[a]n exposition of the constitution" that "ought not to be lightly disregarded"; and post-ratification practices left "a considerable impression"); *accord* The Federalist No. 37, at 229 (James Madison) (Clinton Rossiter ed.,

7

1961) (predicting the meaning of "obscure and equivocal" provisions will "be liquidated and ascertained by a series of particular discussions and adjudications").

"For more than 200 years," the Supreme Court "has relied on history when construing vague constitutional text in all manner of constitutional disputes," including First Amendment ones. *United States v. Rahimi*, 602 U.S. 680, 717 (2024) (Kavanaugh, J., concurring); *id.* at 728–29 (compiling over thirty cases, including *Wilson*). Indeed, the text-and-history method is "the ordinary approach to constitutional interpretation." *Cf. id.* at 732. Even in precedent-saturated fields, such as the freedom of speech, "the [constitutional] text, as well as pre-ratification and post-ratification history," exert "a gravitational pull on the Court's interpretation of precedent." *Id.* at 730; *see also id.* at 732 n.7 (noting the Court's frequent reliance on history in free-speech cases). Most relevant for our purposes as an inferior court, that gravitational pull provides guardrails "[w]hen determining how broadly or narrowly to read a precedent." *Id.* at 730. It also helps us avoid "a policy-based" interpretive approach, *id.* at 731, that is unmoored from the Constitution's original meaning. And in any event, a focus on text, history, and tradition helps us take care not "to read judicial opinions like statutes," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 426 (2024) (Gorsuch, J., concurring), or to allow litigation over modern doctrinal frameworks like tiers of scrutiny to "take on a life of its own and do more to obscure than to clarify the ultimate constitutional questions," *TikTok Inc. v. Garland*, 145 S. Ct. 57, 74 (2025) (Gorsuch, J., concurring).

For these reasons, after ordering rehearing *en banc*, we asked the parties to brief historical practices that might shed light on Crist's claim. The parties nonetheless again built their arguments only on contemporary doctrine. We are "entitled to decide" this appeal based on the parties' arguments. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022). However, we believe a more thorough treatment is warranted; we will "conduct a more robust historical inquiry" even though it's "not [our] burden" to do so. *United States v. Ayala*, 711 F. Supp. 3d 1333, 1338 (M.D. Fla. 2024). Following *Wilson*'s methodology, to analyze the novel compelled-speech question that Crist raises, we survey probative historical practices before turning to modern judicial decisions.

# V.

The States did not begin issuing driver licenses until the 20th Century—long after ratification of the First and Fourteenth Amendments. For example, Florida began issuing its licenses in 1939. *See* Ch. 19551, § 26, Laws of Fla. (1939). Even so, several older analogues may provide at least some evidence on whether the foundational premise of Crist's novel claim—that government-issued identification compels the holder's speech—squares with the original meaning of the Freedom of Speech Clause. We discuss them below.

*Passports and proto-passports.* "[E]arly American passports were consistently issued by the executive authorities of the colonies." Leonard S. Goodman, *Passports in Perspective*, 45 Tex. L. Rev. 221, 240 (1966) ("Goodman"). For instance, seventeenth-century Virginia settlers had to procure "passes from the Governor to leave the colony," and by 1756, "[a] travel pass was required by British authority for travel between" colonies. Dep't of State, *The United States Passport: Past, Present, Future* 7, 9 (1976) ("The United States Passport"). During the early republic, both federal authorities and the States issued "many variations" of passports and passport-like documents; Congress did not assert an exclusive control over passports until 1856. *Id.* at 171; *see also id.* at 9 ("Although the issuance of passports has always been under the jurisdiction of the Department of State, conflicting passport issuances by local and state authorities took place concurrently until 1856."); *id.* at 31, 207 (describing the 1856 Act).

These early passports and proto-passports at times contained highly personal details and descriptions—both flattering and unflattering—of the person to whom they were issued. An example on the flattering end of the spectrum is the 1805 passport that Connecticut Governor Jonathan Trumbull issued to Professor Benjamin Silliman. The document described Silliman as being "of very respectable parentage," having "had a liberal Education at our College of Yale," and having planned "a voyage to Europe" for a "laudable purpose." *Id.* at 20. In at least one other state, passports were required to describe the holder's personal character and reputation. "As early as 1779," New Jersey required residents

travelling outside their county of residence to first obtain a pass "certifying that the Bearer . . . is . . . a Person of good Repute" and "generally esteemed a Friend to the present Government." Goodman at 242 (quoting An Act to prevent Persons from passing through this State without proper Passports, N.J. Sess. Laws, June 10, 1779).

Some passports issued under early federal authority were less effusive, with blunt descriptions of the bearer's features. For example, a 1796 passport issued by a U.S. foreign minister plenipotentiary to James Grubb described him as having a "small mouth, large nose, large forehead," and "long chin." The United States Passport at 40. A similar 1795 passport issued to Samuel Potts described him as "bald" and having a "large Nose, high Forehead, . . . and long Face." Gaillard Hunt, *The American Passport: Its History and a Digest of Laws, Rulings, and Regulations Governing Its Issuance by the Department of State* 82 (1898) ("Hunt") (describing the Potts passport as "[t]he first recorded passport issued abroad"). In 1835, "the first special passport to a free person of color" was issued to John Browne; it described his complexion as "yellow." *Id.* at 15. An 1831 special passport described its bearer as "deprived of the faculties of hearing and speaking." *Id.* at 18. By 1837, the Secretary of State required passport applications to disclose detailed descriptions of personal physical features. The United States Passport at 141.

By the late nineteenth century, the State Department had made clear that the holders of passports were prohibited from altering them. Hunt at 94. This prohibition reflected the principle that "[t]he form of the passport as an official open letter from the secretary of state to other state officials meant that a citizen carried the passport as a messenger, not as the owner of the document." Craig Robertson, *The Passport in America: The History of a Document* 23 (2010) ("Robertson"). "The State Department believed a passport's authority rested on the issuing government maintaining a 'paramount right over it,'" and "the bearer of a passport could not mark the document in any way." *Id.* at 23–25.

*Seamen's protection certificates.* In 1796, Congress enacted legislation in response to the growing problem of impressment of American sailors on British ships. *See* An Act for the Relief and

Protection of American Seamen, ch. 36, § 1, 1 Stat. 477 (1796). The statute required federal customs collectors to keep registries of U.S. citizens serving as seamen on American vessels. *Id.* § 4. "[A]t the request of any seaman" who proved his U.S. citizenship, a customs collector had to issue a certificate that attested to the seaman's citizenship and had to list him in the registry. *Id.* The statute further directed that the certificates "describ[e] the said seaman as particularly as may be," *id.*, and that the records periodically be transmitted to the Secretary of State, *id.* § 7.

Records indicate that seamen's protection certificates kept to Congress's command and were quite descriptive—often, uncomfortably so. An online database of the lists kept by seven customs districts includes nearly 31,000 entries dated between 1796 and 1871, and it discloses numerous colorful descriptions.[6] Among the most notable examples from our perusal: "pit on his forehead"; "Scar between his eyes"; "Lost his left Eye"; "lame in left leg"; "scar on right instep & cross eyed"; "much pitted with smallpox"; and "bald & a small scar on top his head." Longer noteworthy descriptions include: "scar on the middle of forehead-little finger of left hand crooked"; "the second toe of his right foot has been split scar on left knee right arm crooked"; "has a mole on each breast, scar on left leg-two crooked fingers"; "has two small hair moles on left side his face & a large scar on calf of left leg from a scald"; "Scar on left wrist, one on the left shoulder has lost the left eye & the right one disfigured"; "large scar on right hand warts on right eye"; and "bit by dog on his right arm-Scar on his head."

---

[6] *See Registers of Seamen's Protection Certificates*, Mystic Seaport Museum, https://research.mysticseaport.org/databases/protection/ (last visited Aug. 11, 2025). "The original records are in the possession of the National Archives at Boston, in Waltham, Massachusetts." *Id.* "In general, they only have the original registers, not the protection certificates themselves (with rare exceptions)." *Id.* Readers can access the descriptions that we cite by searching keywords in the chart's "Other" field. We also have compiled an appendix that contains copies of the original register pages that we quote in this opinion. We publish them with permission of the National Archives and Records Administration. *See* Appendix to Opinion.

These frank and detailed personal descriptions share a common trait: they all speak of their subjects in the third person. Thus, they clearly reflect the observations and messages of government officials—the federal customs collectors—rather than the speech of the seamen themselves.

*Vital records.* The practice of compiling vital records "traces its origins to our early history." *Gore v. Lee*, 107 F.4th 548, 551 (6th Cir. 2024). "In 1639, the Massachusetts Bay Colony required civil registration of births, marriages, and deaths." *Id.* at 551–52. "Two centuries later, Massachusetts again set the pace when it required town clerks in 1842 to collect information about newborns, including their sex, and forward it to the State." *Id.* at 552. "The other States adopted similar laws in the nineteenth and twentieth centuries." *Id.* As the U.S. Court of Appeals for the Sixth Circuit concluded when rejecting a claimed due-process right to remove or alter accurate information on birth certificates, the history of state vital records demonstrates that "the State has considerable discretion in what they should say: what they should record, what language they should use, and when if at all they should be amended." *Id.* at 565.

\* \* \*

We hesitate to draw any firm conclusions from our limited historical survey, but we think it suggests at least a few general propositions. First, throughout our Nation's history—including the founding era and the early republic—governments have issued documents and kept records that pertain to individuals. Second, those documents and records communicated government messages, and the government determined their content. Third, at least certain kinds of early American documents included personal details that the holder may have found embarrassing, may not have endorsed, or may have wished not to publicly advertise. And finally, we are aware of no national tradition recognizing a right to alter or redact these sorts of personal details, even as to documents—like passports and seamen's protection certificates—that were carried on one's person and presented to others.

12

Taken together, these propositions "pose[ ] a problem for" Crist's compelled-speech claim. *Wilson*, 595 U.S. at 475. In short, we have located "no evidence suggesting prior generations thought" a person's "speech might be 'abridg[ed]' by" the inclusion of accurate (but embarrassing) personal information on a government-issued identification document. *Id.* at 477 (quoting U.S. Const. amend. I).

## VI.

"What history suggests," the Supreme Court's "contemporary doctrine confirms." *Id.* In particular, the Court's decisions counsel that "any speech on [a] . . . driver's license . . . is government speech," *Corbitt*, 115 F.4th at 1352, and the sexual predator marking on Crist's license—an accurate, albeit embarrassing, item of personal information—does not compel him to speak or otherwise convey the fact that it acknowledges, *see id.* at 1353; *see also Doe*, 2016 WL 5339804, at *16–18.

## A.

The Supreme Court's First Amendment decisions repeatedly have drawn a distinction between government speech and private speech. As to the former, subject to certain narrow constraints (addressed in the next section of this opinion), "[a] government entity has the right to speak for itself," "is entitled to say what it wishes," and may "select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009) (quotation marks and citations omitted). "That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech." *Walker v. Tex. Div., Sons of Confederate Vets., Inc.*, 576 U.S. 200, 207 (2015). It also reflects the reality that "government would not work" if it could not control the content of its messages. *Id.*

In his supplemental brief, Crist concedes that his driver license marking is government speech. That concession is well-taken. To identify government speech, the Court weighs three factors: "(1) whether the medium at issue has historically been used to communicate messages from the government; (2) whether the public reasonably interprets the government to be the speaker;

and (3) whether the government maintains editorial control over the speech." *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017) (citing *Walker*, 576 U.S. at 209–14). In *Walker*, the Court weighed these factors and held that Texas's specialty license plate program conveyed government speech. 576 U.S. at 219.

If specialty license plates convey government speech notwithstanding the licensee's choice over which plate to display, *see id.* at 203, 217, then driver licenses surely do. First, Florida historically has used driver licenses to communicate a government message—chiefly, its identification of those permitted to drive in the state. *See Department History*, Fla. Highway Safety & Motor Vehicles, https://www.flhsmv.gov/about/department-history/ (last visited Aug. 11, 2025) (explaining that Florida first required licenses in 1939 and imposed testing in 1941); § 322.01(18), Fla. Stat. (stating that a driver license is a "certificate that . . . authorizes an individual to drive a motor vehicle"). Second, the public recognizes that Florida issues driver licenses, and it therefore associates those licenses with the State. *See Walker*, 576 U.S. at 212 ("Texas license plates are, essentially, government IDs . . . . [P]ersons who observe designs on IDs routinely—and reasonably—interpret them as conveying some message on the [issuer's] behalf." (quotation marks omitted)). Third, Florida retains physical control over licenses and editorial control over their content, and it affords licensees less choice over content than did the specialty plate program at issue in *Walker*. *See, e.g.*, § 322.14, Fla. Stat. (mandating what the Department of Highway Safety and Motor Vehicles must include on licenses); *id.* § 322.15(1) (requiring that driver licenses not be "faded, altered, mutilated, or defaced"); *id.* § 322.16 (authorizing the State to impose license restrictions); *id.* § 322.059 (requiring surrender of a driver license); *id.* § 322.22 (authorizing the department to cancel or withhold renewal of a license); *State v. Etienne*, 930 A.2d 726, 735 n.12 (Conn. App. Ct. 2007) (noting the back of a Florida driver license contains the statement, "[t]he state of Florida retains all property rights herein")[7]; *cf. Walker*, 576 U.S. at 203, 217

---

[7] Throughout this opinion, when we use possessive phrases like "Crist's driver license" or "his license," we speak colloquially; we do not imply that Crist has any property rights in the license.

14

(describing the level of choice that Texas's specialty plate program affords). Even as to the designations that drivers may elect, the State provides the exclusive—and short—menu of options. *See* § 322.14(1)(c)–(e), Fla. Stat. (deaf and hard of hearing, veteran, and certain other designations). Accordingly, a Florida driver license's content is pure government speech.

We don't have to guess how the *Walker* framework applies to government-issued identification cards like driver licenses; *Walker* explicitly addresses the matter. As the Supreme Court noted, "issuers of ID 'typically do not permit' the placement on their IDs of 'message[s] with which they do not wish to be associated,'" and, therefore, "'persons who observe' designs on IDs 'routinely—and reasonably—interpret them as conveying some message on the [issuer's] behalf.'" 576 U.S. at 212 (quoting *Summum*, 555 U.S. at 471). Other courts have taken this teaching at face value. As a California federal district court has held, "[t]o the extent that a [marked] passport"—a form of federal identification— "communicates information, it does so on behalf of the issuing government, not the passport holder." *Doe*, 2016 WL 5339804, at *18. And as the U.S. Court of Appeals for the Eleventh Circuit has held, "any speech on an Alabama driver's license, including the sex designation, is government speech," and "the fact that [drivers] may take part in providing some physical identification information for inclusion on their licenses does not extinguish the governmental nature of State-issued identification." *Corbitt*, 115 F.4th at 1352. So, too, anyone who examines a Florida driver license would understand that the government controls the content and therefore would not attribute its information to the individual tendering the license.

Perhaps most telling, we know of no split in authority on this issue; all three decisions that accepted compelled-speech claims like Crist's nonetheless acknowledged that marked driver licenses convey government speech. *See Doe 1*, 367 F. Supp. 3d at 1325 ("The message here is indeed government speech. After all, the State issues the ID cards and controls what is printed on them."); *Hill*, 341 So. 3d at 552 (holding that a marked identification card compels speech "even though an identification card is government speech"); *Nelson*, 714 F. Supp. 3d at 809 (noting that Louisiana's marked driver license requirement "has qualities of both

compelled and government speech"). We have no trouble concluding the same as to Florida's marked license.

## B.

Even where government speech is involved, "a government's ability to express itself is" not "without restriction." *Walker*, 576 U.S. at 208. One such restriction derives from "the Free Speech Clause itself": the government may not "compel private persons to convey the government's speech." *Id.* Here, we encounter the question that has generated the decisional split on claims like Crist's: does a government identification card compel the holder to speak its contents? The Eleventh Circuit and a California federal district court answer, "no." *See Corbitt*, 115 F.4th at 1353; *Doe*, 2016 WL 5339804, at \*18. Two other federal district courts and the Louisiana Supreme Court answer, "yes." *See Nelson*, 714 F. Supp. 3d at 808–09; *Doe 1*, 367 F. Supp. 3d at 1324–25; *Hill*, 341 So. 3d at 554–55. We think the Eleventh Circuit and the California federal court have the better reading of the Supreme Court's leading compelled-speech decisions.[8]

In *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), the Supreme Court acknowledged that the Constitution protects a right *not* to speak. There, the Court held that the First Amendment prohibits government from compelling

---

[8] We find it unnecessary to analyze the Court's compelled subsidy, access, association, hosting, and publication cases, as Crist raises a straightforward compelled-speech claim, rather than these other kinds of claims. *See, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (claim of compelled hosting of third-party speech); *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878 (2018) (compelled subsidy); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) (claim of compelled access); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005) (claim of compelled subsidy); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (compelled association); *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557 (1995) (compelled association); *Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241 (1974) (compelled publication).

its citizens to salute the flag and recite the pledge of allegiance. *Barnette*, 319 U.S. at 642. As the Court famously explained, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.*

Several decades later, the Court accepted another compelled-speech claim in *Wooley v. Maynard*, 430 U.S. 705 (1977). The *Maynard* plaintiffs sought an injunction against a statute requiring them to display the New Hampshire state motto, "Live Free or Die," on their vehicle license plates. 430 U.S. at 709. As the Court explained, their case presented "the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." *Id.* at 713. In holding that the statute burdened the plaintiffs' First Amendment right to refrain from speaking, the Court noted that "New Hampshire's statute in effect requires that [they] use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty." *Id.* at 715. Put another way, "[a]s a condition to driving an automobile—a virtual necessity for most Americans—the Maynards must display 'Live Free or Die' to hundreds of people each day." *Id.* The Court contrasted the "mobile billboard" nature of the license plate motto with state seals and mottos on documents, the purpose of which "is not to advertise the message it bears but simply to authenticate the document by showing the authority of its origin." *Id.* at 715 n.11. It likewise drew a contrast with the national motto on coins and currency, which are "passed from hand to hand" and "generally carried in a purse or pocket." *Id.* at 717 n.15. The Court went on to hold that the statute triggered and failed heightened scrutiny. *Id.* at 716–17.

More recently, the Court sustained another compelled-speech claim in *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ("*NIFLA*"). There, the State of California required licensed, pro-life pregnancy resource centers to advertise the availability of state-subsidized abortions through notices "posted in the waiting room, printed and distributed to all clients, or provided digitally at check-in." *NIFLA*, 585 U.S. at 763. It also

17

required unlicensed centers to "conspicuously" post "at the entrance . . . and in at least one waiting area"—as well as in all advertising materials—a notice advising that they have no medical license and no licensed medical provider. *Id.* at 764. The Court held that both notice requirements likely compel speech in violation of the First Amendment. *Id.* at 779. As to the first notice requirement, the Court observed that "licensed clinics must provide" to their clients "a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them." *Id.* at 766. "One of those services is abortion—the very practice that petitioners are devoted to opposing." *Id.* Thus, "[b]y requiring petitioners to inform women how they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly alters the content of petitioners' speech." *Id.* (quotation marks omitted). The Court likewise held that the second, unlicensed notice requirement "imposes a government-scripted, speaker-based disclosure requirement." *Id.* at 777.

Finally, just two years ago, the Court accepted a compelled-speech claim in *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023). There, the Court held that the Colorado Civil Rights Commission could not force a Christian-owned business and its owner to convey on their wedding websites messages that conflict with their religious beliefs. In so holding, the Court noted that the websites at issue "qualify as 'pure speech'" because each will be an "'original, customized' creation" made by the plaintiffs for the purpose of "communicat[ing] ideas," including the celebration and promotion of what the plaintiffs "understand[ ] to be a true marriage." *303 Creative*, 600 U.S. at 587 (quotation marks omitted); *see also id.* at 593–94 (noting that the websites would contain "'customized and tailored' speech for each couple" and "will be expressive in nature, using text, graphics, and in some cases videos to celebrate and promote the couple's wedding and unique love story"). And the Court repeatedly noted the fact that the parties had stipulated to the expressive nature of the websites. *See id.* at 587, 588, 593–94, 597–98, 599. In short, Colorado sought to "forc[e] an individual to create speech on weighty issues with which she disagrees." *Id.* at 599. The Court held that this effort to compel speech ran afoul of the First Amendment and decades of Supreme Court precedent construing it. *Id.* at 601–03.

Crist's driver license exhibits none of the characteristics that the Court found material in *Barnette*, *Maynard*, *NIFLA*, and *303 Creative*. Unlike the compulsory pledge, the license does not compel Crist to "confess by word or act [his] faith" in a government-prescribed "orthodoxy." *Barnette*, 319 U.S. at 642. Unlike a state motto on a license plate, Crist's driver license does not require him to use it as a "mobile billboard" to display the State's message to "hundreds of people each day." *Maynard*, 430 U.S. at 715. Nor does it require him to use it "as a *stationary* billboard" for the State's message, either. *McClendon v. Long*, 22 F.4th 1330, 1337 (11th Cir. 2022). Unlike a sex offender yard sign, for instance, a marked driver license is not used to display or advertise a message to the public. *Cf. id.* (holding that, under the First Amendment, law enforcement cannot compel a sex offender to post a public warning sign in his front yard). Unlike California's pregnancy center notices, a sexual predator marking on a driver license is not a "government-drafted script" conspicuously posted in a public area or included in advertising materials, and it does not alter the content of Crist's speech or otherwise dictate what he says about the topic it concerns. *NIFLA*, 585 U.S. at 766. And unlike a custom wedding website, a driver license is not an "original, customized creation" made by the holder for the purpose of communicating the holder's message. *303 Creative*, 600 U.S. at 587. In sum, whatever the test for compelled speech, Crist's claim does not resemble in any material way the claims at issue in *Barnette*, *Maynard*, *NIFLA*, and *303 Creative*.

Because of these obvious and material distinctions, we need not distill a definitive test for compelled speech to decide this case. However, for the sake of a comprehensive analysis, we note that courts often—but not always—require a compelled-speech litigant to show that the challenged government practice creates a perception that he endorses the government's message. *Compare, e.g.*, *Cressman v. Thompson*, 798 F.3d 938, 949 (10th Cir. 2015) (applying *Johanns* and requiring appearance of endorsement), *with McClendon*, 22 F.4th at 1337 (applying *Maynard* and rejecting an endorsement requirement). This appeal does not require us to articulate a comprehensive framework for when an appearance of endorsement is required. On this point, the Eleventh Circuit's precedent is instructive. The Eleventh Circuit

declined to apply the endorsement test in *McClendon*. *See* 22 F.4th at 1337. Nonetheless, it later held that driver license designations do not compel speech, and it did so without applying an endorsement requirement. *See Corbitt*, 115 F.4th at 1353. We agree with the Eleventh Circuit's analysis in *Corbitt*.

Of course, Crist's claim necessarily falters under the stronger endorsement test. As the U.S. District Court for the Northern District of California put it, "[a] mark on a passport identifying the holder as a registered sex offender is neither an 'opinion' which is being attributed to the passport holder, nor a misleading statement," and "the identifier is not a public communication and will not even be displayed to the public." *Doe*, 2016 WL 5339804, at *18. As such, the identifier will not be "attributed to—or deemed to be endorsed by—the private party" on whose identification it appears. *Id.* Instead, the identifier will be understood as the government's message and the government's message alone. *Id.* And, just as with birth certificates, "[t]he mere fact that a person presents a document to a third-party does not mean that the person endorses or is appearing to endorse everything stated in the document." *Gore v. Lee*, No. 3:19-CV-0328, 2023 WL 4141665, at *35 (M.D. Tenn. June 22, 2023), *aff'd on other grounds*, 107 F.4th 548 (6th Cir. 2024). "[T]o the contrary, experience shows that people often present documents under circumstance that would disabuse anyone of the notion that the person is endorsing all (or perhaps even any) of the contents of the document." *Id.* So, too, with Crist's driver license.

Crist's claim faces yet another obstacle that precludes a conclusion of compelled speech, no matter the test we might use: "'[T]he act of presenting identification,' or 'handing government documents . . . to someone else, has never been considered a form of expressive conduct . . . .'" *Fowler v. Stitt*, 676 F. Supp. 3d 1094, 1105 (N.D. Okla. 2023) (quoting *Int. of C.G.*, 976 N.W.2d 318, 341, 345 (Wis. 2022)), *aff'd in part, rev'd in part on other grounds*, 104 F.4th 770 (10th Cir. 2024). In this respect, driver licenses are more like currency and birth certificates than license plates, public notices, yard signs, or websites. A person does not "in any meaningful way affirm[ ] the [national] motto by using currency." *Mayle v. United States*, 891 F.3d 680, 686 (7th Cir. 2018). As the Supreme Court noted in *Maynard*, "[c]urrency is generally carried

in a purse or pocket and need not be displayed to the public," and "[t]he bearer of currency is thus not required to publicly advertise the national motto." 430 U.S. at 717 n.15; *accord Mayle*, 891 F.3d at 686 ("[M]ost people do not brandish currency in public—they keep it in a wallet or otherwise out of sight until the moment of exchange."). Similarly, the holders of driver licenses do not parade them about but instead keep them out of sight unless and until a need to present them arises. Therefore, they do not advertise any government messages that the licenses contain.

For all the above reasons, Crist's marked driver license does not compel his speech. Any reasonable observer will understand that it's the *State's* message that Crist is a sexual predator, just as it's the State's message that he is licensed to drive in Florida and has a certain "date of birth, height, weight, or eye color." *Doe*, 2016 WL 5339804, at *18. And by marking Crist's license—a personal identification card normally hidden from public view—rather than his front yard, office entrance, business advertisements, personal vehicle, or custom website, the State has not compelled Crist to publicly display or disseminate its message.

## C.

Our understanding of the Supreme Court's compelled-speech doctrine solidifies when we consider lower-court decisions that have applied that jurisprudence in analogous contexts. In several ways, accepting Crist's claim would call into question vital government functions and place us out of step with the great weight of judicial authority in adjacent areas. *See United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (rejecting a compelled-speech claim against an IRS summons, and noting that "[t]here is no right to refrain from speaking when 'essential operations of government may require it for the preservation of an orderly society[ ]—as in the case of compulsion to give evidence in court'" (quoting *Barnette*, 319 U.S. at 645 (Murphy, J., concurring))).

To be sure, as we already have seen, the Eleventh Circuit and Northern District of California have rejected claims like Crist's. *See Corbitt*, 115 F.4th at 1352–53 (holding that sex designations on driver licenses do not compel speech); *Doe*, 2016 WL 5339804, at *18 (rejecting compelled-speech claim against the federal sex-

offender identifier for U.S. passports). And as one of those courts recognized, any other result would carry no clear limiting principle. *See Doe*, 2016 WL 5339804, at *18 (noting that if the First Amendment confers a right not to have one's identification display a truth that the holder finds inconvenient or embarrassing, the identification will "cease to function as reliable government-issued identification"); *cf. Crist v. State*, No. 5D2022-2966, 50 Fla. L. Weekly D177 (Fla. 5th DCA Jan. 10, 2025), *vacated on reh'g en banc* (noting that license-holders may not "like certain facts about themselves to be known, such as . . . their age (for vanity or other reasons), their sex presented in a binary mode (a contemporary matter of controversy), or that they are a certain height").

Moving beyond those two decisions, that lack of limiting principle becomes more obvious, as Crist's claim runs up against a host of analogous federal and state decisions as well. For example, lower courts have rejected compelled-speech claims that sought to remove or alter accurate information on vital records like birth certificates, or that sought to allow sex offenders to change their legal names. *See Int. of C.G.*, 976 N.W.2d 318 (Wis. 2022) (rejecting compelled-speech claim against statute prohibiting sex offenders from changing their legal names); *Fowler*, 676 F. Supp. 3d at 1107–08 (rejecting compelled-speech claim against sex designation on state birth certificates); *Gore*, 2023 WL 4141665, at *34–36 (same). We don't see any principled reason to treat Crist's claim differently. The holders of birth certificates and other similar records occasionally must present them to others, just as the holders of driver licenses must. And no less than driver licenses, these records contain truthful information about the persons whom they concern. Accepting Crist's claim, therefore, would stand in tension with federal and state decisions rejecting compelled-speech claims against—and upholding states' control over—the content of government-issued vital records.

Crist's claim also is hard to square with decisions that have rejected compelled-speech claims against the national motto on United States currency. *See Mayle*, 891 F.3d at 686; *New Doe Child #1 v. Cong. of the U.S.*, 891 F.3d 578, 593–94 (6th Cir. 2018). In these cases, litigants unsuccessfully argued that they are compelled to speak "In God We Trust" when they present currency to others during commercial transactions. In rejecting these

claims, the courts noted that they are flatly inconsistent with the Supreme Court's dictum in *Maynard*. *See* 430 U.S. at 717 n.15 ("Currency is generally carried in a purse or pocket and need not be displayed to the public. The bearer of currency is thus not required to publicly advertise the national motto."); *see also Mayle*, 891 F.3d at 686 (relying on *Maynard*'s dictum); *New Doe Child #1*, 891 F.3d at 593–94 (same). We find these decisions instructive; it's not obvious to us why presenting a driver license would compel the holder's speech any more than presenting currency would.

Finally, Crist's claim stands in tension with a host of federal and state decisions that have rejected compelled-speech claims against sexual offender registration and reporting requirements. Unlike a driver license, which the holder passively presents when circumstances require, sex-offender registries require offenders affirmatively to report their criminal histories and residential addresses, often for publication. Many offenders have claimed that these requirements unconstitutionally compel their speech; courts repeatedly have rejected that claim. *See, e.g.*, *United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) (holding that the registration requirement of the federal Sex Offender Registration and Notification Act ("SORNA") does not unconstitutionally compel speech); *Martin v. Hayes*, No. 2:24-CV-3-FL-KS, 2025 WL 634833, at *6 (E.D.N.C. Jan. 17, 2025) (holding same, noting that "[c]ourts have found that sex offender registration requirements are not compelled speech," and compiling cases); *United States v. Doby*, No. 18-CR-40057-HLT, 2019 WL 5825064, at *3–5 (D. Kan. Nov. 7, 2019) (holding same); *United States v. Fox*, 286 F. Supp. 3d 1219, 1222–24 (D. Kan. 2018) (holding same); *see also People v. Ruiz*, No. F074673, 2017 WL 4682707, at *1–2 (Cal. Ct. App. Oct. 19, 2017) (rejecting compelled-speech claim against California's sex-offender registration requirement); *State v. Ontiberos*, 527 P.3d 948 (Kan. Ct. App. 2023) (Memorandum) (noting an appellant's failure to "identify any state or federal court authority which has invalidated an offender registration law on First Amendment grounds"); *State v. Masterson*, 515 P.3d 753 (Kan. Ct. App. 2022) (Memorandum) (rejecting compelled-speech claim against Kansas's sex-offender registration requirement); *Davis v. Thompson*, No. 19-3051-SAC, 2019 WL 6327420, at *3 (D. Kan. Nov. 26, 2019) (same); *Does v. Whitmer*, 751 F. Supp. 3d 761, 821–26 (E.D. Mich. 2024) (rejecting compelled-speech claim against

Michigan's sex-offender reporting requirements); *Prater v. Linderman*, No. 1:18-cv-992, 2019 WL 6711561, at \*9 (W.D. Mich. Dec. 10, 2019) ("A public sex offender registry does not violate a sex offender's First Amendment rights."); *Medina v. Cuomo*, No. 7:15-CV-01283 (GTS/TWD), 2015 WL 13744627, at \*10 (N.D.N.Y. Nov. 9, 2015) (rejecting compelled-speech claim against New York's sex-offender registration and reporting requirements); *Grant-Davis v. Wilson*, No. 2:19-cv-0392-DCN-TER, 2021 WL 4596614, at \*4 (D.S.C. July 15, 2021) (rejecting compelled-speech claim against South Carolina's sex-offender registration and reporting requirements); *cf. Willman v. Att'y Gen. of the U.S.*, 972 F.3d 819, 825 (6th Cir. 2020) (rejecting First Amendment privacy challenge to SORNA's registration requirement and reiterating that "'[t]he Constitution . . . does not encompass a general right to nondisclosure of private information'" (quoting *J.P. v. DeSanti*, 653 F.2d 1080, 1090 (6th Cir. 1981))).

On all these closely related questions in similar contexts, accepting Crist's claim would risk putting us on a collision course with the great weight of existing judicial authority. *See, e.g.*, *Corbitt*, 115 F.4th at 1352–53; *Doe*, 2016 WL 5339804, at \*18; *Int. of C.G.*, 976 N.W.2d at 345–46; *Fowler*, 676 F. Supp. 3d at 1107–08; *Gore*, 2023 WL 4141665, at \*34–36; *Mayle*, 891 F.3d at 686; *New Doe Child #1*, 891 F.3d at 593–94; *Arnold*, 740 F.3d at 1035; *Martin*, 2025 WL 634833, at \*6; *Doby*, 2019 WL 5825064, at \*3–5; *Fox*, 286 F. Supp. 3d at 1222–24; *Ruiz*, 2017 WL 4682707, at \*1–2; *Ontiberos*, 527 P.3d 948; *Masterson*, 515 P.3d 753; *Davis*, 2019 WL 6327420, at \*3; *Whitmer*, 751 F. Supp. 3d at 821–26; *Prater*, 2019 WL 6711561, at \*9; *Medina*, 2015 WL 13744627, at \*10; *Grant-Davis*, 2021 WL 4596614, at \*4. If we harbored any doubts about how to apply the Supreme Court's compelled-speech jurisprudence to this appeal, the accumulated wisdom of these state and federal decisions—which carefully grappled with that jurisprudence—would soundly resolve them in the State's favor.

## D.

One might respond that accepting Crist's claim under the rubric of strict scrutiny would allow us to avoid this morass by empowering us to draw the fine distinctions needed to differentiate these analogous cases. We doubt that simply declaring "compelling

interest" and "least restrictive means" whenever a future litigant's claim seems too unworkable—or whenever the challenged law seems too important—will reflect any satisfactory principle. *See Rahimi*, 602 U.S. at 731 (Kavanaugh, J., concurring) (describing the labels for various forms of means-end scrutiny, and observing that, "[w]hatever the label of the day, that balancing approach is policy by another name" because "[i]t requires judges to weigh the benefits against the burdens of a law and to uphold the law as constitutional if, in the judge's view, the law is sufficiently reasonable or important"). But even putting aside the difficulty of finding a principled path to avoid its likely implications for analogous cases, on its own terms, accepting Crist's claim would thrust us into a policymaking arena of its own: the fraught business of micromanaging the content of the State's identification cards. In fact, this is exactly what Crist urges us to do in his supplemental *en banc* brief. In his concluding prayer for relief, he asks us to hold—and we quote—that Florida's marked-license statutes "are unconstitutional and should be revised to allow for either a code, statute numbers or a number/letter combination."

Lest readers dismiss our warning as hyperbole or Crist's prayer as a pipe dream, they would do well to consider the lived experience of courts that have accepted compelled-speech claims in this context. Recall that the Louisiana Supreme Court and an Alabama federal court accepted claims like Crist's. *Hill*, 341 So. 3d at 555; *Doe 1*, 367 F. Supp. 3d at 1324–27. Both courts' strict-scrutiny reasoning split some hairs. The Louisiana Supreme Court recognized that "the state certainly has a compelling interest in protecting the public and enabling law enforcement to identify a person as a sex offender." *Hill*, 341 So. 3d at 553. But it held that "Louisiana has not adopted the least restrictive means of doing so," because the State had employed a capitalized descriptive phrase in "big orange letters," whereas "[a] symbol, code, or a letter designation" would have sufficed. *Id.* at 551, 553; *accord Nelson*, 714 F. Supp. 3d at 809 (repeating *Hill*'s analysis).

The Alabama federal court similarly acknowledged that "[t]he State has a compelling interest in enabling law enforcement to identify a person as a sex offender." *Doe 1*, 367 F. Supp. 3d at 1326. However, the court likewise faulted the State for a lack of narrow tailoring: "By using 'CRIMINAL SEX OFFENDER' instead of a

25

single letter, the State goes beyond what is necessary to achieve its asserted interest." *Id.* And indeed, after the Alabama Legislature responded to *Doe 1* by enacting a revised marked license that employed a code rather than a descriptive phrase, the same federal court—the same U.S. district judge, in fact—upheld it under the rubric it had announced in *Doe 1. See McGuire v. Marshall*, 741 F. Supp. 3d 1112, 1200–01 (M.D. Ala. 2024). As the court saw it, "[u]nlike, 'CRIMINAL SEX OFFENDER' in large red font, the CV606 indicator is coded and in small black font." *Id.* at 1200. While the court earlier had suggested a "single letter" was all the Constitution allowed, *Doe 1,* 367 F. Supp. 3d at 1326, it nonetheless permitted two letters and three numbers—albeit "in small black font"—when the matter returned to its docket. *McGuire,* 741 F. Supp. 3d at 1200.

If ever there were an example where "litigation over [strict scrutiny] can sometimes take on a life of its own and do more to obscure than to clarify the ultimate constitutional questions," *TikTok Inc.,* 145 S. Ct. at 74 (Gorsuch, J., concurring)—or where "means-end scrutiny" becomes "policymaking," *Rahimi,* 602 U.S. at 731, 734 (Kavanaugh, J., concurring)—the Louisiana and Alabama experiences would be it. We find implausible the notion that the federal Constitution draws lines based on whether one's driver license identifies his criminal history by phrase, code, or single letter, or on the font size or color of the text. What is the maximum allowable font size, and can the font color be something other than black so long as it isn't red or orange? When does capitalization cross the line? What code is perceptible enough to law enforcement but obscure enough for the general public? And what if the code becomes widespread public knowledge in the future? Must the State offer a new code every five or ten years to stay ahead of the curve? For that matter, why isn't alerting the select members of the public with whom a sexual predator closely interacts also a compelling governmental interest? For all the reasons set forth in this opinion, we do not think that the First Amendment to the United States Constitution dictates any answers here. It leaves these quintessential policy questions not to the courts, but rather to the People's elected representatives and the democratic process.

# VII.

Finally, we offer a few words in response to the dissent. We believe there is room for legitimate debate over the merits of the First Amendment claim that we decide today. After all, courts have divided over whether government-issued identification can compel speech. The dissenting opinion strays out-of-bounds, however, in its critique of the fullness of our First Amendment analysis and its assertion that our decision exceeds the scope of Crist's appeal.

To begin, the dissenting opinion jousts a straw man. It asserts that we hold government speech is not subject to compelled-speech analysis. If that were so, one might wonder why we devote nine pages to a thorough review of the Supreme Court's compelled-speech jurisprudence and a score of lower-court precedents that apply it. We certainly didn't bury the lede. As we acknowledge at the outset of our expansive compelled-speech discussion, "[e]ven where government speech is involved, 'a government's ability to express itself is' not 'without restriction,'" and "[o]ne such restriction derives from 'the Free Speech Clause itself': the government may not 'compel private persons to convey the government's speech.'" *Supra* at 15–16 (quoting *Walker*, 576 U.S. at 208). The dissent can disagree with our conclusion that Crist's driver license does not compel his speech, but it's a patent misreading to suggest our analysis ends at government speech.

The dissenting opinion compounds its misapprehension of our opinion with a misapprehension of our judicial role. It is a basic tenet of our state appellate system that the appellant has the burden to demonstrate error, *see Lynn v. City of Ft. Lauderdale*, 81 So. 2d 511, 513 (Fla. 1955), and the appellee has no countervailing burden, *see MacNeill v. O'Neal*, 238 So. 2d 614, 615 (Fla. 1970). As a well-established corollary to that principle, the appellant has a preservation-and-presentation requirement, but the appellee does not. *See Freeman v. State*, 373 So. 3d 1255, 1257 n.2 (Fla. 1st DCA 2023) ("[A]n appellee need not present to the appellate court the grounds for affirming the judgment of the trial court."). Indeed, a Florida appellate court may properly affirm a judgment even where the appellee fails to file an answer brief or wrongly confesses error. *See id.* ("[T]he appellate court may affirm even when the appellee does not serve an answer brief."); *Powell v. State*, 223 So.

3d 412, 413 n.1 (Fla. 5th DCA 2017) ("A confession of error . . . is not binding upon an appellate court, and it is the practice of Florida appellate courts not to accept erroneous concessions by the state." (quoting *Perry v. State*, 808 So. 2d 268, 268 (Fla. 1st DCA 2002))); *Sims v. State*, 260 So. 3d 509, 513 (Fla. 1st DCA 2018) ("[W]e are not required to accept the State's confession, and before we reverse any criminal judgment, we must be certain the law requires reversal."). Simply stated, shortcuts and omissions in appellate briefs do not relieve us of our obligation to get the law right. Otherwise, an appellant's initial brief and an appellee's omissions or concessions could combine to re-write the law.

To be sure, in normal adversarial proceedings like this one, it generally is the appellant who must present the claims on appeal. *See Williams v. State*, No. 2024-2334, 2025 WL 2092230, at *2 n.5 (Fla. 5th DCA July 25, 2025) ("We are well aware that, at least in Florida, the party presentation principle applies to an appellant, but not necessarily to an appellee."); *cf. id.* at *5 n.8 (noting "rare and limited exceptions to the adversarial nature of our system that require a court to take a more engaged role," and citing as an example *Doe v. Uthmeier*, 407 So. 3d 1281 (Fla. 5th DCA 2025)); *see also Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (en banc).[9] Our opinion honors that party-presentation principle.

---

[9] Our dissenting colleagues' proof-text of *Rosier* particularly puzzles us. In *Rosier*, the *en banc* First District rejected the dissent's proposal to *reverse* a conviction on grounds not raised *by the appellant*. *Compare* 276 So. 3d at 406 ("We . . . hold that Rosier waived any argument on the adequacy of the competency hearing when he failed to raise the issue in the initial brief."), *and id.* ("For an appellant to raise an issue properly on appeal, he must raise it in the initial brief. Otherwise, issues not raised in the initial brief are considered waived or abandoned."), *with id.* at 425 (Makar, J., dissenting) (advocating reversal and faulting the majority for its "unwillingness to look beyond the initial brief"). It should go without saying that affirming a conviction by rejecting the claim that the appellant raises (as we do here) is a far cry from *reversing* his conviction on a ground he *never raised* (as the *Rosier* dissent unsuccessfully advocated).

Here, Crist has claimed that the sexual predator marking on his license compels his speech in violation of the First Amendment. We have resolved that claim and only that claim, and we have explained the appropriate legal framework for arriving at the answer. As the dissenting opinion would have it, we must not only resolve Crist's claim, but we must cram our answer into the cramped analytical framework that he posed to the panel and the State initially chose to brief—*i.e.*, whether the marking meets strict scrutiny's narrow-tailoring test. That framing skips the government-speech analysis conducted even by the federal and state decisions on which the dissenting opinion relies. It also wrongly assumes that the marking compels Crist's speech. And it elides the historical inquiry, instead advancing a theory that wrongly would have us micromanage the method the State uses to mark sexual predators' driver licenses.[10]

For the same reason, the dissent's repeated invocations of *United States v. Sineneng–Smith*, 590 U.S. 371 (2020), are likewise unavailing. There, the Ninth Circuit reversed a criminal conviction based on a constitutional claim that the appellant "herself never raised earlier"—a court-initiated claim that the statute of conviction was unconstitutionally overbroad. *Id.* at 374. Indeed, the appellant "had presented a contrary theory of the case in the District Court." *Id.* at 380. It was this "takeover of the appeal," *id.* at 379, that prompted the Supreme Court's vacatur of the decision. Yet again, it should go without saying that what we do here— *affirm* a conviction by rejecting *the precise claim* that the appellant has preserved and presented—bears no resemblance to *reversing* a conviction on an *unraised claim*.

[10] None of our analysis should surprise. In our unanimous supplemental briefing order without any registered dissent, the *en banc* court directed the parties to address the two questions that Crist's claim necessarily raises under the correct legal framework: whether the sexual predator marking is government speech, and whether the marking compels Crist's speech. Quoting *Wilson*, we encouraged them to brief historical practices that might shed light on those two questions. The order also told the parties to address *Corbitt* and asked them to address cases dealing with compelled-speech claims in related contexts like vital records and U.S. passports, citing several examples. To the extent the dissenting

While we confine our adjudication to the claim that Crist has presented below and on appeal, we rightly refuse to outsource our judicial role in doing so. It's *our* responsibility to explain the law that governs the claim the appellant has presented to us, and we decline the dissent's demand to delegate our responsibility to the parties. *Cf. Hicks v. State*, 277 So. 3d 153, 156 n.3 (Fla. 1st DCA 2019) ("Nor can we accept the dissent's view that we are acting unfairly by '*sua sponte* rais[ing] new issues.' . . . It is the appellant's burden to show we must reverse, and he cannot meet that burden without overcoming all bases for affirmance." (citations omitted)).

\* \* \*

For the foregoing reasons, we reject Crist's as-applied First Amendment challenge to sections 322.141(3)(a) and 322.212(5)(c), and we affirm his conviction.

AFFIRMED.

JAY, C.J., and EISNAUGLE, BOATWRIGHT, KILBANE, and MACIVER, JJ., concur.

EISNAUGLE, J., concurs with opinion in which PRATT, J., concurs.

KILBANE, J., concurs with opinion in which EDWARDS, J., concurs.

SOUD, J., concurs in result with opinion.

HARRIS, J., concurs in result only without opinion.

MAKAR, J., concurs in part and dissents in part with opinion in which WALLIS, J., concurs.

LAMBERT, J., recused.

---

opinion contends that the parties have not had a full and fair opportunity to address the analysis that we perform in this opinion, our unanimous briefing order shows otherwise.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____



Appendix to Opinion

| date | No. | Names | age | | Complexion | State | Town | Means |
|---|---|---|---|---|---|---|---|---|
| 1790 | | | | | | | | |
| Aug 21 410 | | Yeomans Ebenezer | 20 | 5 11 | light | Connecticut | Stonington | No twelve 112 |
| 1797 | | | | | | | | |
| June 10 454 | | Yarrington Ezekiel | 43 | 5 7 | " | " | " | 17 |
| Apr 6 514 | | Young Nathaniel | 18 | 5 7 | " | " | Norwich | " |
| 15 568 | | Young Thomas | 26 | 5 9½ | " | " | Windham | " |
| Aug 7 674 | | Yates Israel | 19 | 5 9 | " | " | Preston | " |
| Sep 11 744 | | Young Nathaniel | 18 | 5 7½ | " | " | Norwich | " |
| 1798 | | | | | | | | |
| Jan 20 854 | | Young William | 25 | 5 7½ | " | " | " | " |
| 1799 | | | | | | | | |
| Nov 2 1447 | | York Kehilul | 19 | 5 7 | dark | " | Preston | " |
| 5 1455 | | York | 19 | 5 6 | Negro | " | Groton | " |
| 1800 | | | | | | | | |
| April 8 1663 | | Yorke | 26 | 5 9½ | " | New Jersey | Morristown | " |
| June 13 1730 | | Young William | 23 | 5 9½ | light | Connect. | Hebron | " |
| Aug 15 1782 | | Yenington Lot | 30 | 6 | dark | " | Preston | " |
| 1801 | | | | | | | | |
| June 6 2137 | | Young Edward | 19 | 5 7 | light | " | Windham | " |
| May 26 2440 | | York Augustus | 26 | 6 | " dark eyes sandy hair | | Stonington | 5 |
| 1803 | | | | | | | | |
| Aug 17 2557 | | Young Richard D. | 18 | 5 8¼ | " reddish hair | " | New London | 5 |
| Oct 20 2625 | | Yarrington Elisha | 18 | 5 9½ | " | " | Lisbon | " |
| 1804 | | | | | | | | |
| Feby 10 2773 | | Yarrington Wm | 19 | 6 | scar on left knee | | Mansfield | " |
| May 12 2932 | | York Wm Junr | 23 | 5 11 | dark | R. Island | Charlestown | " |
| | | a scar on the back part of his head mole on his stomach first joint of forefinger on the left hand broken | | | | | | |
| 1805 | | | | | | | | |
| May 7 3258 | | York Stephen | 20 | 5 11 | " | " | " | 4 |
| | | scar on the middle of his head little finger of left hand crooked | | | | | | |
| Oct 23 3466 | | Yarrington Elijah | 20 | 5 8 | light | Connecticut | Norwich | 4 |
| 3467 | | Young William | 13 | 4 8 | " | " | New London | 3 |
| | | dot on his forehead | | | | | | |
| Nov 25 3570 | | Uriah Hyde | 18 | 4 4½ | negro | Africa | | residence |
| 1806 | | | | | | | | |
| June 20 3819 | | Young Thomas | 11 | 4 6 | light | Connecticut New London | | Nativity 3 |
| | | scar on outside right foot | | | | | | |
| Aug 12 3878 | | Yarrus Fredrick | 19 | 5 8 | " | Masachusetts Springfield | | 4 |
| | | scar on back of right hand | | | | | | |
| 1809 Mar 2 4530 | | Young John | 23 | 5 9 | | Maryland | Baltimore | 2 |
| | | has light eyes dark hair a scar over right eye & on right wrist | | | | | | |
| Oct 1 4744 | | Young Benjamin | 23 | 5 5 | darkish | R.I. | Charlestown | " |
| 1810 | | | | | | | | |
| May 23 4846 | | Gale John | 18 | 5 5½ | dark | Connect. | Norwich | 3 |
| | | one scar on right arm & one on left thigh | | | | | | |
| 1811 | | | | | | | | |
| June 20 5724 | | Yphus Samuel | 19 | 5 8¾ | Negro | | Lebanon | 3 |
| | | scar in the left face | | | | | | |
| Dec 10 5303 | | Gale Theophilus | 22 | 5 6 | darkish | " | Norwich | 3 |
| | | scar under the left ear gone in the palm of right hand | | | | | | |
| 23 5305 | | Young Henry | 19 | 5 4 | light | | New London | 3 |
| | | large scar on the right leg | | | | | | |

A-1

| Date of Certificate | No. | Names of Seamen | Age | Feet | Inches | Comp | Hair | Eyes | State or Country | Town or County | Citizen Where Obtained | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1815 Dec 26 | 5747 | Weightman Valentine | 17 | 5 | 4½ | Dark | Dark | Dark | Connecticut | Bozrah | Birth | |
| 1816 Jan 1 | 5749 | Whapler Anson | 22 | 5 | 4½ | light | light | light | " | Wethersfield | " | |
| " May 3 | 5781 | Winchester William | 19 | 5 | 8½ | light | light | light | " | Groton | " | Scar Rt foot |
| " June 21 | 5795 | Welch George | 21 | 5 | 10½ | Dark | Dark | Dark | " | Windham | " | |
| | 5796 | Waters James | 19 | 5 | 9½ | Dark | Dark | Dark | " | Hartford | " | |
| | 5797 | Wickham Timothy | 16 | 5 | 5 | light | light | light | " | Hartford | " | |
| " Sep. 18 | 5808 | White David S. | 17 | 5 | 4½ | light | light | light | " | Groton | " | Lost his left Eye, double & anchor, Right arm & W. eye arm |
| 1817 Sep 18 | 5856 | Willard Elisa | 57 | 5 | 11 | light | grey | light | " | East Hartford | " | Scar left Ankle |
| " Nov 29 | 5861 | Whittery John B. | 14 | 5 | 2 | light | light | light | " | Groton | " | Scar on back head & legs arm & forefing. |
| " Dec. 13 | 5865 | Walden James | 36 | 5 | 9 | light | Brown | Dark | " | Waterford | " | a negro |
| 1818 Apr 29 | 5877 | Williams John | 37 | 5 | 4½ | Black | Black | Black | Rhode Island | Rhode Island | " | |
| " Sep. 30 | 5891 | Willcox Sylvester | 17 | 5 | 8½ | Dark | Dark | Dark | Connecticut | Stonington | " | a mulatto |
| " Dec. 22 | 5897 | Wilbur Charles | 23 | 5 | 7 | Copper | Black | Black | " | New Chester | " | |
| 1819 July 27 | 5936 | Wood Alfred A. | 18 | 5 | 8½ | light | light | light | " | Groton | " | Scar Rt Eye toe |
| " 23 | 5942 | Weeks John | 23 | 5 | 2 | light | light | light | " | Lyme | " | |
| " Nov. 11 | 5948 | Wood Otis | 21 | 5 | 5 | light | Dark | grey | " | E. Windsor | " | |
| 1820 May 2 | 5968 | Willcox Isaac | 29 | 5 | 9 | light | light | light | Rhode Island | Westerly | " | |
| " July 10 | 5998 | Wheat William G. | 18 | 5 | 9½ | light | light | grey | Connecticut | New London | " | |
| " | 6007 | Willcox William | 19 | 5 | 11 | dark | dark | grey | " | Stonington | " | Scar Lt leg |
| " | 6009 | Willcox John | 18 | 5 | 9 | light | light | light | " | " | " | Scar Lt leg |
| " | 6022 | Williams Geo. W. | 24 | 5 | 8½ | dark | brown | black | " | Say Brook | " | Chir & mark on his left wrist |
| " Nov. 23 | 6044 | Wade Nathaniel | 23 | 5 | 9 | light | brown | blue | " | Norwich | " | Scar between his eyes |
| 1821 Jan 21 | 6048 | Wait Lott | 20 | 5 | 4 | light | brown | grey | " | New London | " | |
| " Mar. 8 | 6063 | Warren Samuel | 22 | 5 | 4 | light | brown | dark | Massachu. | Boston | " | Scar upper Lip |
| " July 10 | 6092 | Wade Daniel L. | 30 | 5 | 8½ | " | light | light | New Jersey | Hanover | " | |
| " 13 | 6094 | Worden Eleakim | 23 | 5 | 5 | dark | brown | dark | New Hampshire | Grinwell | " | |
| " Sept. 8 | 6112 | Weightman Wm. Jun. | 22 | 6 | 1 | light | light | light | Connecticut | Groton | " | |
| " 10 | 6114 | Williams John | 20 | 5 | 9½ | black | Wool | Black | Virginia | | " | Scar on left Thumb |
| " Nov. 16 | 6134 | Weeks James | 19 | 5 | 3 | light | dark | blue | Connecticut | Montville | " | Scar on right shoulder |
| 1822 Sept 28 | 6191 | Webb Samuel | 31 | 5 | 6½ | light | dark | " | R. Island | Charlestown | " | Scar on left knee |
| " 29 | 6192 | Wolfe Elisa E.d | 25 | 5 | " | dark | Dark | light | Connecticut | Groton | " | |
| " 30 | 6201 | Whittelsey Parker | 15 | 5 | 7¼ | dark | light | dark | Connecticut | Nantucket | " | |
| " Oct. 12 | 6218 | Wood George | 15 | 5 | 6 | light | brown | " | Massachus. | Springfield | " | |
| " | 6222 | Walkley William | 21 | 5 | 8½ | dark | dark | blue | " | Hadley | " | |
| " " | 6230 | Way Charles | 18 | 5 | 8½ | Negro | | | " | Grays | " | mark on right Ear |
| 1823 April 8 | 6240 | Webster James | 20 | 5 | 6½ | light | black | light | Maine | Stonington | " | Scar on left knee |
| " 16 | 6244 | Williams Charles P. | 19 | 5 | 10¼ | dark | dark | hazel | Connecticut | New York | " | |
| " May 17 | 6260 | Wellson David S. | 21 | 5 | 6 | light | Light | " | New York | Windham | " | Scar on left knee |
| " Jun. 30 | 6277 | Webb Edwin | 16 | 5 | 6½ | dark | " | hazel | Connecticut | Windham | " | |
| " July 5 | 6285 | Webb Edwin | 16 | 5 | 6½ | " | " | " | R. Island | Providence | " | Scar on his Chin |
| " 7 | 6287 | Wheaton Mason | 25 | 5 | 7 | dark | Black | Light | R. Island | Groton | " | |
| " 10 | 6289 | White Thomas | 18 | 5 | 8 | light | dark | hazel | Connecticut | Lyme | " | Scar on neck & right arm |
| " Nov. 13 | 6304 | Way Thomas P. | 23 | 5 | 4½ | " | light | light | " | | " | |

A-2

| Date | No. | Name | Age | Ft | In | Complexion | State | Town |
|---|---|---|---|---|---|---|---|---|
| Jan 5 | 3145 | Haslop George | 19 | 5 | 5½ | light | Virginia | Accomack |
| Feby 2 | 3154 | Hyde Cyrus | 21 | 5 | 8 | dark | Massachusetts | Granby |
| 23 | 3164 | Holmes Joseph | 23 | 5 | 9¼ | " | " | Middlebury |
| Mar 11 | 3171 | Hill Joseph | 37 | 5 | 8½ | " | Connecticut | Middletown |
| April 7 | 3180 | Haslett William | 20 | 5 | 8 | light | Maryland | Baltimore |
| 23 | 3190 | Herrington Cyrus | 13 | 4 | 8 | " | Connecticut | Lisbon |
| " | 3191 | Howard Ephraim | 19 | 5 | 11 | " | R. Island | W. Greenwich |
| " | 3213 | Spencer Benson | 25 | 5 | 4 | " | Connecticut | Stonington |
| " | 3214 | Lewis | 22 | 5 | 8 | " | Connecticut | |
| Jun 1 | 3224 | Hebbard Elisha | 20 | 5 | 10½ | " | " | Windham |
| " | 3243 | Hartson Tracy | 22 | 5 | 9½ | " | " | Mansfield |
| " | 3244 | Hebbard Harvey | 23 | 5 | 11 | dark | " | Windham |
| " | 3254 | Hemenway Chandler | 21 | 5 | 9½ | light | " | Fair Haven |
| 9 | 3278 | Harvey Amos | 19 | 5 | 5 | darkish | R. Island | Westerly |
| 14 | 3302 | Holdridge Henry | 15 | 4 | 11 | light | Connecticut | Groton |
| " | 3303 | Havard George | 18 | 5 | 9½ | " | R. Island | Charlestown |
| " | 3308 | Helme Ray | 17 | 5 | 7½ | " | " | South Kingston |
| 15 | 3311 | Havard Brenton W | 21 | 6 | 2 | " | " | Charlestown |
| " | 3314 | Sealy William | 29 | 5 | 5 | " | " | South Kingston |
| " | 3316 | Hyde Horace P | 19 | 5 | 4 | " | Massachusetts | Granville |
| 14 | 3323 | Howard Sweden | 25 | 5 | 9½ | dark | Connecticut | Woodstock |
| 17 | 3332 | Hull Russel | 21 | 5 | 9½ | light | " | Stonington |
| 27 | 3345 | Hubbard Ira Jun | 22 | 5 | 10 | " | " | Norwich |
| 28 | 3347 | Herrman Horace | 23 | 5 | 8½ | " | " | Suffield |
| June 29 | 3371 | Haskell Timothy | 14 | 4 | 4½ | " | " | Middletown |
| July 27 | 3384 | Humphrey Elic | 25 | 5 | 6½ | " | " | Hartford |
| 31 | 3391 | Hempstead Ezra B | 21 | 5 | 4 | " | " | New London |
| Aug 17 | 3404 | Havens Samuel | 24 | 5 | 8½ | Indian | New York | Islip |
| 23 | 3411 | Hebbard Henry | 19 | 5 | 4¾ | light | Connecticut | Boston |
| 24 | 3415 | Hender Samuel | 19 | 5 | 6 | " | " | Hartford |
| 27 | 3419 | Hunt Theophilus | 24 | 5 | 6 | " | New York | New York |
| Sept 4 | 3429 | Harris William | 23 | 5 | 9 | colour | Connecticut | Norwich |
| 30 | 3447 | Hamilton Richard | 16 | 5 | 9 | darkish | " | New London |

A-3

Nov. 30 5282 Spicer Eldredge 13 4 11 light Connecticut Groton Waterbury
scar on the great toe of right foot & one about the right knee

Dec. 12 5293 Smith Edward 15 5 4½ of Colour " Bozrah "
scar in the forehead

16 5300 Stiles Samuel 18 5 10 light " Windsor "
inclining to dark

21 5316 Woodard Jun. Wm 23 6 " " Groton "
scar in the left cheek & one on the right leg

Jany. 11 5314 Simons James 22 5 5½ of Colour " Salisbury "

5315 Shearman Nicholas 15 4 10 light Rhode Island South Kingstown
scar on the right thigh & one on the right side

18 5316 Sisson Daniel L 21 6 " " Westerly "
darkish hair & eyes & scar in each foot

Feby. 14 5326 Smith William 30 5 7½ " Mass. Freetown
scar on one finger of left hand

Mar. 16 5344 Sloan William 26 5 3¾ " Connecticut East Hartford "
two scars on the left leg

23 5349 Stark Dudley 16 5 4½ " " Chester "
scar on left hand &c

April 4 5360 Southworth Ebor 15 5 2 " " Saybrook "
dark hair & eyes — scar in each knee

May 18 5375 Shapler John 54 5 8¼ " Massachusetts Beverly "
scar on the left leg — small scar on the right wrist

June 8 5382 Swan Joshua Jun 19 5 9 " Connecticut Stonington "
has a blemish on the left eye & scar over each eye

9 5384 Stanton Anderson 22 5 7½ " " " "
scar on right instep, cross eyed

5385 2½ née Thorne 23 5 8½ " " " "
scar with right wrist & under the chin

Nov. 5 5426 Smith James Jun 13 4 4½ " " New London "
scar in the right great toe

5427 Stout John 21 5 7 of Colour Pennsylvania Philadel. "
scar on the top of head — one at the lower part of belly & one on the right ear

Dec. 4 5440 Stephenson Francis 30 5 5¾ " Connecticut Hartford "
small scar on bridge of nose & one on the forehead

11 5453 Smith James 45 " light " New London "
scar on left side & scar in thumb of left hand

20 5461 Stacy John 28 5 11½ Negro New York Bridge Hampton "
scar on right eye & a speck in his right eye

10 5449 Smith Asher 14 5 6½ " Connecticut Glastenbury "
scar on right hand

12 5455 Sawyer Elisha 18 5 6½ light " Lyme "
scar on left foot

Jany. 8 5469 Sette John 23 5 5½ negro " Hartford "
scar in right cheek & one on left arm &c

Feby. 22 5479 Sisson Charles 18 5 7 light " New London "
scar on right shin

Mar. 5 5494 Smith John 23 5 10 " " Waterford "
small scar on the right great toe

April 12 5507 Smith John 22 5 8¾ darkish " New London "

5511 Sprague David 15 4 6 light " " "

14 5513 Smith Francis 23 5 " " " " "
small scar on each — & on right hand &c

5514 Smith Emerson 19 5 11 " " " "

June 17 5533 Searl John 54 5 5¾ " Massachusetts Cape Cod "

5534 Simmons Robert 16 5 5 " " Chatham "
see S under 6 1809

| date | n° | Names | age | | | Complexion | State | Town | Means |
|---|---|---|---|---|---|---|---|---|---|
| 1798 | | | | | | | | | |
| Feby 26 | 14 | Etheridge Mark | 21 | 5 | 9 | light | Connecticut | Groton | Nobody in list |
| Aug 24 | 108 | Eames Cyrus | 25 | 5 | 4½ | " | " | Preston | " |
| Sep 6 | 131 | Exeter Cyrus | 20 | 5 | 3 | Negro | " | New London | " |
| 23 | 172 | Eddy Joel | 18 | 5 | 5½ | light | " | Woodstock | " |
| Oct 19 | 218 | Ellis Jona | 17 | 5 | 7 | " | R Island | Westerly | " |
| 25 | 236 | Eames Comfort | 33 | 5 | 4 | " | Connecticut | Lisbon | " |
| Nov 26 | 336 | Emerson Dudley | 16 | 5 | 7½ | dark | " | Norwich | " |
| Dec 21 | 391 | Rogers John | 36 | 5 | 8 | " | Massachu | Boston | " |
| 26 | 421 | Fly Daniel | 19 | 5 | 6½ | light | Connecticut | Lyme | " |
| 1799 | | | | | | | | | |
| Mar 20 | 503 | Edgar Thomas | 48 | 5 | 6½ | " | England | Newcastle | Settlement |
| Apr 10 | 551 | Eldridge Anna | 20 | 5 | 7 | " | Connecticut | Stonington | Nativity |
| Aug 31 | 692 | Eames Gideon | 21 | 5 | 5½ | dark | " | Norwich | " |
| Sep 9 | 711 | Edward Thomas | 20 | 5 | 10 | light | " | Westerly | " |
| Oct 23 | 754 | Edward Jn Wilber | 21 | 5 | 5½ | " | " | New Milford | " |
| Nov 6 | 774 | Eaton William | 40 | 5 | 7 | " | " | Chatham | " |
| 1798 | | | | | | | | | |
| Sep 28 | 901 | Endicott James | 22 | 5 | 10½ | " | " | Hartford | " |
| Nov 2 | 971 | Exeter Joseph | 22 | 5 | 10 | " | " | Preston | |
| | 981 | Nixon | | | | | | | " |
| Sep 28 | 1015 | Eames Gideon | 22 | 5 | 6 | dark | " | Lisbon | " |
| 1799 | | | | | | | | | |
| Aug 26 | 1347 | Evans Elijah | 15 | 5 | 4 | light | " | E Hartford | " |
| Oct 12 | 1391 | Eldredge Bela | 17 | 5 | 3 | " | " | Windham | " |
| 25 | 1423 | Eldredge Thos | 21 | 6 | 3 | | | " | " |
| Nov 5 | 1456 | Elias | 40 | 5 | 1 | Negro | " | Norwich | " |
| 9 | 1465 | Elton James | 18 | 5 | 5½ | dark | " | Canaan | " |
| 13 | 1470 | Ely Seth | 20 | 5 | 6½ | darkish | Massachu | W Springfield | " |
| 23 | 1488 | Eldridge Daniel | 37 | 5 | 7½ | light | R Island | Newport | " |
| 29 | 1510 | Eldridge Nathan | 25 | 5 | 9½ | " | " | Westerly | " |
| | 1514 | Emerson Barlow | 17 | 5 | 7¾ | " | Connecticut | Norwich | |
| 1800 | | | | | | | | | |
| Feb 13 | 1634 | Ely Aaron | 21 | 5 | 7¾ | " | " | Lyme | " |
| Aug 8 | 1773 | Eldredge Zach | 20 | 6 | 4 | " | Massachu | Boston | " |
| 14 | 1781 | Ely Gates | 23 | 5 | 9 | " | Connecticut | Lyme | " |
| 26 | 1799 | Eldridge Gardner | 19 | 5 | 7¾ | " | " | Stonington | " |
| 28 | 1824 | Clark Elijah | 18 | 5 | 7 | " | " | Norwich | " |
| Sep 6 | 1838 | Edward James | 21 | 5 | 5 | light | " | New York | " |

| Date | No. | Name | Age | ft | in | Complexion | Nativity | Town | |
|---|---|---|---|---|---|---|---|---|---|
| Sept. 19 | 3113 | Waterford Hugh | 22 | 5 | 8 | light | Connecticut | Hartford Nativity | |
| | | scar on left toe | | | | | | | |
| 25 | 3118 | Wade George | 18 | 5 | 8¾ | dark | " | Norwich | |
| | | scar on left thigh | | | | | | | |
| Oct. 4 | 3120 | Williams Calvin | 21 | 5 | 7¾ | light | " | Saybrook | |
| | | scar on inside right leg & scar &c | | | | | | | |
| 20 | 3142 | Waldron Nath | 23 | 5 | 4½ | dark | " | Stonington | |
| | | small scar on each knee both of right foot | | | | | | | |
| 23 | 3157 | Wells Marlbroug | 24 | 5 | 8¾ | light | " | " | |
| Nov. 4 | 3957 | Williams Alex | 16 | 5 | | " | " | Plainfield | |
| | | 2 finger of left hand has a broken nail | | | | | | | |
| 10 | | | | 5 | 4 | | " | | |
| Dec. | | Hunt Thomas | | 5 | | light | " | Windham | " |
| 10 | 4052 | Whipple James | 21 | 5 | 11¾ | dark | " | New London | " |
| 20 | 4 | Woodhouse | 20 | 5 | 10 | light | " | | " |
| 23 | 4015 | Wilson Thomas | 22 | 5 | 4 | dark | Massachusett | Lynn | |
| 25 | 3016 | | 20 | 6 | 0½ | light | " | Farmen | |
| 1807 | 4 | | 21 | 5 | 10 | light | | | |
| 12 | 4007 | | 20 | 5 | 6½ | | Rhode Island | Westerly | |
| 19 | 4044 | Walker John | 16 | 5 | 10 | light | Connecticut | | |
| Feb. 11 | 4054 | Whipple John | 14 | 4 | 4 | " | " | Preston | " |
| Mar. 20 | 4065 | Wagener | 15 | 3 | | " | " | Hartford | |
| | | large blemish on right arm | | | | | | | |
| Apr. 6 | 4074 | Wells Ephraim | 23 | 5 | 5 | " | " | Winchester | " |
| | | a scar on top of left foot | | | | | | | |
| May 1 | 4104 | Wells Silas | 39 | 5 | 8 | " | " | Fairfield | " |
| | | bald & small scar on top his head | | | | | | | |
| 4 | 4112 | White Amos | 19 | 5 | 6¾ | dark | Rhode Island | Hopkinton | " |
| | | a scar on left side his neck & mole near thigh | | | | | | | |
| | 4115 | Wilcox Jeffery | 23 | 5 | 9 | light | | Exeter | |
| | | two middle fingers on right hand much contracted, scar on ball | | | | | | | |
| | 4119 | Wilcox Joseph | 18 | 5 | 6½ | " | Connecticut | Stonington | |
| | | a scar under right eye | | | | | | | |
| 5 | 4141 | Wilcox John | 20 | 5 | 9 | " | " | " | |
| | | a blemish on right eye & scar on left side his neck | | | | | | | |
| 7 | 4148 | Wanton James | 42 | 5 | 6¾ | Mulatto | Rhode Island | New Port | |
| | | scar on left hand | | | | | | | |
| 8 | 4154 | Williams Peter | 55 | 5 | 6 | light | Connecticut | Groton | " |
| 11 | 4168 | West Simeon | 17 | 5 | 3½ | " | Rhode Island | Westerly | " |
| | | scar on right shin | | | | | | | |
| 14 | 4214 | Wait Clarke | 20 | 5 | 9¼ | " | N York | Petersburgh | |
| | | scar on left knee & left thumb | | | | | | | |
| 15 | 4233 | Williams Denison | 19 | 5 | 9 | " | Connecticut | Stonington | " |
| | | small scar on left hand & large on right thigh | | | | | | | |
| | 4243 | Wilkinson John | 18 | 5 | 7 | | " | " | |
| | | scar on fore finger of left hand | | | | | | | |
| | 4244 | Wilkinson Jonath | 16 | 5 | 5 | " | " | " | |
| | | scar on right hand | | | | | | | |
| 16 | 4253 | Wobey Richard | 18 | 5 | 4 | " | New York | New Paltz | " |
| | | scar under right eye | | | | | | | |
| 19 | 4274 | West George | 18 | 5 | 4½ | " | Rhode Island | Westerly | " |
| 23 | 4292 | Wills Arnold | 44 | 5 | 10 | " | " | Hopkinton | " |
| | | large scar on right foot & outside of left leg | | | | | | | |

A-6

XYZ

| date | No. | Names | age | | | Complexion | State | Town | Means |
|---|---|---|---|---|---|---|---|---|---|
| 1796 | | | | | | | | | |
| Dec 21 | 640 | Newman Ebinezer | 20 | 5 | 11 | light | Connecticut | Stonington | no teligion red |
| 1797 | | | | | | | | | |
| Jan 10 | 454 | Yarrington Ezekiel | 43 | 5 | 9 | " | " | " | " |
| Apr 6 | 514 | Young Nathaniel | 18 | 5 | 7 | " | " | Norwich | " |
| 15 | 548 | Young Thomas | 26 | 5 | 9½ | " | " | Windham | " |
| Aug 7 | 674 | Yates Israel | 19 | 5 | 9 | " | " | Preston | " |
| Sep 11 | 714 | Young Nathaniel | 18 | 5 | 7½ | " | " | Norwich | " |
| 1798 | | | | | | | | | |
| Jan 20 | 854 | Young William | 25 | 5 | 7½ | " | " | " | " |
| 1799 | | | | | | | | | |
| Nov 2 | 1467 | York Robert N. | 19 | 5 | 7 | dark | " | Preston | " |
| 5 | 1455 | York | 19 | 5 | 6 | Negro | " | Groton | " |
| 1800 | | | | | | | | | |
| April 8 | 1663 | Yorke | 26 | 5 | 9½ | " | New Jersey | Morristown | " |
| June 13 | 1730 | Young William | 23 | 5 | 9½ | light | Connect. | Hebron | " |
| Aug 15 | 1782 | Yennington Lot | 30 | 6 | | dark | " | Preston | " |
| 1801 | | | | | | | | | |
| June 6 | 2137 | Young Edward | 19 | 5 | 7 | light | " | Windham | " |
| May 26 | 2440 | York Augustus | 24 | 6 | | " dark eyes sandy hair | " | Stonington | " |
| 1803 | | | | | | | | | |
| Aug 17 | 2559 | Young Richard V. | 18 | 5 | 4¼ | " red curl hair | " | New London | " |
| Oct 20 | 2625 | Yarrington Elisha | 18 | 5 | 7½ | " | " | Lisbon | " |
| 1804 | | | | | | | | | |
| Feb 10 | 2773 | Yarrington Wm | 19 | 6 | | scar on left hand | " | Plainfield | " |
| May 12 | 2932 | York Wm Jur | 23 | 5 | 11 | dark R. Island Charlestown | " | a scar on the back part of his head mole under stomack foreign of forefinger on the left hand broken | |
| 1805 | | | | | | | | | |
| May 7 | 3258 | York Stephen | 20 | 5 | 11 | scar on the middle of forehead little finger of left hand crooked | " | " | " |
| Oct 23 | 3466 | Yarrington Elijah | 20 | 5 | 8 | bright | Connecticut | Norwich | " |
| | 3466 | Young William | 13 | 4 | 8 | " | | New London pit on his forehead | " |
| Nov 25 | 3510 | Ulorich Hayde | 18 | 5 | 4½ | Negro | Africa | | residence |
| 1806 | | | | | | | | | |
| June 20 | 3819 | Young Thomas | 11 | 4 | 6 | light | Connecticut New London scar on outside right foot | | Activity |
| Aug 12 | 3878 | Yanus Fredrick | 19 | 5 | 8 | " | Massachusetts Springfield scar on back of right hand | | " |
| 1809 | | | | | | | | | |
| Mar 2 | 4530 | Young John | 23 | 5 | 9 | light eyes dark hair a scar over right eye young right wrist | Maryland | Baltimore | " |
| Dec 1 | 4744 | Young Benjamin | 23 | 5 | 5 | dark | R.I. | Charlestown | " |
| 1810 | | | | | | | | | |
| May 23 | 4846 | Gale John | 18 | 5 | 5½ | dark scar on right arm & one right thigh | Connec. | Norwich | " |
| 1811 | | | | | | | | | |
| June 20 | 5724 | Yippen Samuel | 19 | 5 | 8¾ | Negro scar in the left jaw | " | Lebanon | " |
| Dec 20 | 5303 | Gale Theophilus | 22 | 5 | 6 | auburn scar under the left ear & one in the palm of right hand | " | Norwich | " |
| 23 | 5305 | Young Henry | 19 | 5 | 4 | light large scar on the right leg | " | New London | " |

16

| Date | No. | Name | Age | Ft | In | Complexion | State | Town | |
|---|---|---|---|---|---|---|---|---|---|
| July 7 | 4314 | Wilbur Jeremiah | 16 | 4 | 10½ | dark | New York | Blam Island Newbury | } |

has left scar on his forehead

| 11 | 4328 | Williams John | 17 | 5 | 7½ | light | Rhode Island | Point Judith | } |

has a scar on his forehead under his right eye, a large scar on right arm the forefinger of his right hand has been much jambed.

| Aug 8 | 4362 | Wright Henry | 19 | 5 | 6½ | dark | Connecticut | Wethersfield | } |

scar on right ankle

| Sep 3 | 4373 | Winslow Ichabod | 24 | 5 | 11 | light | Massachusetts | Northfield | } |

a scar on right ankle & left foot

| 22 | 4383 | Watrous L. John | 16 | 5 | 1½ | " | Connecticut | New London | } |

a scar at outer corner of right eye this face very much freckled

| 24 | 4384 | William John | 25 | 6 | 0½ | dark | Massachusetts | Partridgefield | } |

scar on foot

| Oct 7 | 4386 | Wells Edward | 38 | 6 | . | light | Connecticut | Groton | } |

has a Mole on his right cheek & a scar on his left arm.

| 13 | 4388 | Watrous Samuel | 23 | 5 | 8 | " | " | East Haddam | " |

| Nov 4 | 4395 | Welch Samuel | 19 | 5 | 5 | " | Rhode Island | Charleston | } |

has a scar on his left shoulder

| | 4398 | Whitman Samuel | 22 | 5 | 9½ | " | Connecticut | Groton | } |

| 25 | 4417 | Winslow Nathan | 22 | 5 | 7½ | darkish | " | East Haddam | } |

some light hairs on left side his head & a remarkable scar on left side his nose

| Dec 23 | 4460 | Wells Devin | 18 | 5 | 5 | dark | " | Southington | } |

the second toe of his right foot has been split, scar on left knee, right arm crooked

| Mar 4 | 4470 | Woodward Appleton | 22 | 5 | 10½ | light | " | Stonington | " } |

a scar on the fore finger of his left hand & one on shin of left leg

| 11 | 4471 | Williams Fred William | 21 | 5 | 8 | " | New York | Catskill | " |

scar on 3d finger of his left hand

| May 16 | 4490 | Walden George | 23 | 5 | 8¼ | " | Connecticut | Stonington | " } |

has a scar on his chin & on his left wrist

| June 18 | 4450 | Ward Ichabod Jr | 18 | 5 | 4 | " | " | Lebanon | " } |

a scar on his left foot

| | 4529 | Winn Thomas | 27 | 5 | 5 | " | " | Haddam | } |

has a scar on his left temple

| April 4 | 4550 | Widden Charles | 24 | 5 | 6 | " | Pennsylvania | Philadelphia | " } |

a scar across the top of his left foot

| May 2 | 4568 | Williams Talcott | 20 | 5 | 6¼ | " | Connecticut | East Hartford | " } |

dark hair

| 12 | 4583 | Wainter Hubbard | 17 | 5 | 1½ | dark | Connecticut | Berlin | " } |

two scars on his right shin

| 18 | 4597 | Willis Henry | 21 | 5 | 9½ | " | Rhode Island | New horeham | " } |

a scar on his left shoulder

| | 4598 | Willis John | 19 | 5 | 2¾ | " | " | " | } |

dark hair, grey eyes, scar on back right hand

| 25 | 4605 | Wattles Denison Jr | 18 | 5 | 8½ | light | Connecticut | Lebanon | " } |

a large scar on right knee

| 30 | 4609 | Weeden Charles | 27 | 5 | 7½ | Negro | Rhode Island | New Port | " |

| June 5 | 4618 | Woodhouse Sam'l | 17 | 5 | 1 | light | Connecticut | Wethersfield | " } |

a scar on his right arm

| 9 | 4630 | Williams John | 25 | 5 | 8 | Negro | New York | Haddam | " } |

a large scar on left arm

| 20 | 4636 | Wilder Jonathan | 28 | 5 | 9 | light | Massachusetts | Hartford | " } |

a scar on his left hip dark hair & whiskey

| 27 | 4658 | Whipple John | 15 | 4 | 7 | " | Connecticut | Preston | " |

| 29 | 4662 | Warner Andrew | 16 | 5 | 1 | Mulatto | " | Wethersfield | " |

grey eyes

| July 7 | 4678 | White Samuel Jun | 23 | 6 | 1 | light & grey eyes | Mass. | Watertown | " |

| 11 | 4683 | Wells William | 21 | 5 | 11½ | light | R. Island | Providence | " } |

scar on right knee & left shin

| 24 | 4689 | Whipple George | 17 | 5 | 2½ | dark | Connecticut | Preston | " |

| Date | No. | Name | Age | ft | in | Complexion | Nativity | Town | |
|---|---|---|---|---|---|---|---|---|---|
| May 7 | 2401 | Rogers David A | 20 | 5 | 11 | light | Connecticut | New London Waterford | " |
| 1 | 2905 | Roy Joseph | 24 | 5 | 2½ | Molatto | R Island | Westerly | " |
| | 2906 | Roy Thomas | 20 | 5 | 3 | " | Connecticut | Stonington | " |
| | 2908 | Roy Gideon | 22 | 5 | 1 | " | " | " | " |
| 16 | 3024 | Robinson William | 17 | 5 | 7 | indian | R Island | S Kingston | " |
| Oct 30 | 3171 | Risley Timothy | 20 | 5 | 7½ | dark | Connecticut | East Hartford | " |
| | 3172 | Rew John | 17 | 5 | 10½ | " | " | Farmington | " |
| Nov 13 | 3099 | Rowland Uriah | 18 | 5 | 8 | light | " | Canaan | " |
| 14 | 3105 | Robarts Nelson | 14 | 5 | 7½ | " | " | Middletown | " |
| 28 | 3112 | Root Elias | 23 | 5 | 8 | dark | " | Mansfield | " |
| Dec 12 | 3122 | Rathbun Abner | 21 | 5 | 8 | colour | " | Colchester | " |
| 1805 Jan 28 | 3147 | Robertson William H | 18 | 5 | 6½ | dark | " | New London | " |
| Feb 19 | 3152 | Ramsay David | 20 | 5 | 10 | light eyes | " | Glastenbury | " |
| Mar 22 | 3195 | Rising Julius | 25 | 5 | 6 | light | " | Suffield | " |
| | 3208 | Ruut Thomas | 23 | 5 | 8½ | darkish | " | Holland light eyes | |
| 30 | 3279 | Rogers Isaiah Jun | 24 | 5 | 8 | dark | " | Franklin | " |
| May 7 | 3270 | Reynolds William | 23 | 5 | 10½ | light | R Island | Richmond | " |
| | 3271 | Ross Nathan | 19 | 5 | 5 | dark | " | Westerly | " |
| 8 | 3274 | Ranney Calvin | 22 | 5 | 4 | darkish | Connecticut | Chatham | " |
| 18 | 3340 | Rhodes James | 16 | 5 | 7 | light | R Island | Westerly | " |
| June 12 | 3356 | Rhodes Thos R | 14 | 5 | 6¾ | " | " | " | " |
| July 6 | 3373 | Roberts Stephen | 18 | 5 | 5½ | darkish | Connecticut | E Hartford | " |
| 13 | 3376 | Ramsey Alexander | 25 | 5 | 5½ | light | " | Glastenbury | " |
| 31 | 3392 | Rogers Joseph | 22 | 5 | 9¼ | darkish | " | New London | " |
| Aug 23 | 3412 | Roberts Jesse | 21 | 5 | 6 | negro | " | Milford | " |
| Dec 3 | 3450 | Rogers Josiah | 16 | 5 | 5 | darkish | New York | Sagharbor | " |
| 17 | 3462 | Robbins Samuel | 21 | 5 | 5½ | light | Connecticut | Hartford | " |
| 24 | 3475 | Robbins William | 21 | 5 | 5½ | " | " | Wethersfield | " |

| Date | No. | Name | Age | ft | in | Complexion | Birthplace | Town | |
|---|---|---|---|---|---|---|---|---|---|
| Apr. 26 | 4070 | Johnson Gift | 36 | 5 | 5½ | Negro | Connecticut | Middletown | |
| | | his left little finger bent | | | | | | | |
| June 2 | 4294 | Johnson James | 22 | 5 | 6 | " | New York | Ball Town | " |
| | | large scar on toe of right foot one on toe of left foot large pan on ... | | | | | | | |
| 10 | 4322 | Jones Samuel | 16 | 5 | 4½ | light | Massachusetts | Boston | |
| 21 | 4346 | Ingraham Harry | 20 | 5 | 6½ | Negro | Connecticut | Middletown | " |
| | | scar on left side his forehead in the hair | | | | | | | |
| Aug. 12 | 4363 | Fortin Asa | 16 | 5 | 7½ | light | Massachusetts | Hanover | " |
| | | a hurt spot it hair on back his head | | | | | | | |
| Oct. 1 | 4385 | Ingraham Azariah | 18 | 4 | 7½ | dark | Connecticut | Millington | |
| | | a scar on his left thigh, his face freckled | | | | | | | |
| Dec. 8 | 4438 | Jewett Anson | 16 | 5 | 8½ | light | " | Hampton | " |
| | | has two small hair moles on left side his face & a large scar on calf of left leg from a scald | | | | | | | |
| 1808 | | | | | | | | | |
| July 11 | 4459 | Jones Stephen | 24 | 5 | 7 | " | " | New London | " |
| 1809 | | | | | | | | | |
| April 20 | 4555 | Ingersol George | 17 | 5 | 2 | light | Massachusetts | Westfield | " |
| May 9 | 4574 | Johnson James | 21 | 5 | 6 | Negro | Connecticut | Colchester | " |
| | | a scar under his right ear | | | | | | | |
| June 24 | 4654 | Gilson M. George | 17 | 5 | 3 | light | " | Norwich | " |
| July 3 | 4671 | Jones Isaac | 20 | 5 | 6 | grey eyes / reddish | Tyrrel County N. Carolina | | |
| | | great toe of left foot has been cut off scar on left foot scar on left hand | | | | | | | |
| Aug. 5 | 4695 | Johnson Enoch | 39 | 5 | 5½ | lighter | Mass. | Granville | |
| | | several scars on each leg a small blemish in left eye his finger right hand broken | | | | | | | |
| Sept. 27 | 4716 | Johnson Dan | 18 | 5 | 8½ | " | Connecticut | Windham | " |
| 1810 | | | | | | | | | |
| Mar. 8 | 4781 | Johnson Henry | 16 | 4 | 6 | " | " | New London | " |
| | | a scar on his left eye cut right in his right eye | | | | | | | |
| 30 | 4777 | Jack John | 21 | 5 | 11 | Negro | " | Stonington | |
| | | scar on left cheek | | | | | | | |
| June 18 | 4866 | Johnston Westal | 17 | 5 | 11½ | light | " | Granville | |
| | | two scars on left foot | | | | | | | |
| 26 | 4877 | James Charles R. | 16 | 5 | 4 | " | " | Norwich | " |
| | | scar on right leg | | | | | | | |
| 16 | 4863 | Jones Charles S. | 16 | 5 | 2 | " | " | Saybrook | " |
| | | scar on left thigh | | | | | | | |
| July 14 | 4904 | Jones John E. | 21 | 5 | 10 | " | " | " | |
| Oct. 10 | 4936 | Jackling William | 18 | 5 | 10 | Negro | " | Lebanon | |
| | | scar on his little finger of left hand & on his right thigh | | | | | | | |
| Dec. 3 | 4984 | Jack John | 25 | 5 | 7 | light | " | Bordentown | |
| | | scar on his right leg scar on left leg vein in left right leg | | | | | | | |
| 1811 | | | | | | | | | |
| Feb. 2 | 5043 | Johnson William | 14 | 5 | 7 | " | New York | New York | |
| | | dark eyes & hair a small scar on his right leg | | | | | | | |
| 5 | 5049 | Johnson John | 15 | 5 | 1 | dark | Pennsylvania | Philadelphia | |
| | | scar on the left knee | | | | | | | |
| Mar. 16 | 5063 | Jackson William | 16 | 5 | 1 | light | New York | New York | |
| June 20 | 5106 | Johnson William | 20 | 5 | 3¼ | dark | Connecticut | Middletown | " |
| | | pitted with the small pox | | | | | | | |
| | 5127 | Johnston William E. | 19 | 5 | 7¾ | light | " | " | " |
| | | scar on the right cheek | | | | | | | |
| 27 | 5137 | James Nicholas | 24 | 5 | 2 | dark | Territory New Orleans | | |
| | | scar on the left leg | | | | | | | |
| July 19 | 5167 | Ingham Nathan | 21 | 5 | 5½ | light | Connecticut | Groton | |
| | | scar across his right foot & one on left shin | | | | | | | |
| Aug. 8 | 5187 | Johnson Thomas | 13 | 4 | 5½ | " | " | New London | |
| | | freckled in the face | | | | | | | |
| 31 | 5207 | Johnson Seth | 23 | 5 | 7½ | " | " | Middletown | " |
| | | dark hair scar on the head | | | | | | | |
| Sept. 23 | 5226 | Johnson William | 21 | 5 | 5¼ | of color | New York | Staten Island | " |
| | | several scars on the left hand & one on the right arm | | | | | | | |

1812

July 31 5347 Mason ... William 19 5 5 light New Jersey Middletown ...
light eyes dark hair scar on right thumb & right foot

Sept 15 5406 ... 2 19 5 6 Connecticut New London
dark hair scar in the bridge of Nose scar on the right knee

16 ... Patterson 26 5 7½ Lyme
scar on the ... arm one on the left shoulder ...
... the left eye & the right eye disfigured

Nov 4 5439 Moore Rudolph W 23 5 7½ New York Brooklyn
pockmarked a mole near left shoulder & one near left eye

21 5462 Morgan Richard 17 5 6 Connecticut Middletown
1813 ... dark hair scar on left knee

Jan 11 5471 Mills Isaiah 20 5 7 New London
... the left foot

12 5472 Maker Morris 18 5 1 New York Poughkeepsie
scar on back of right hand

Feb 15 5475 McCann John 19 5 7 New York
scar on the right side of his head

22 5486 Halsey Amos 19 5 8 dark Connecticut New London
... finger of left hand

April 3 ... Perry 27 5 7 ...

12 5506 Mason William 26 6 1½ Connecticut New London
scar on the first finger of left hand

May 26 5527 McNiel John 22 5 9 ...
scar on right thigh & mark on right knee

July 22 5538 Naples Stephen 20 5 6½ Norwich
scar on left shin & small scar under left eye

Sept 30 5544 Harris Josiah 17 5 9 New York
... scar on ... right thumb

Dec 19 5513 Morgan Thos 23 5 5 light Connecticut Groton
scar in the right thigh

1814 Sept 21 5556 Morgan William 15 4 10 New Hampshire Portsmouth
black hair

Oct 6 5559 Murray ... 22 5 6 Norwich

5574 Morgan Thomas 23 5 6 scar in ...

1815
April 18 5593 Meacham Selden 20 5 7¼ Connecticut Enfield
... on left arm

19 5616 Kilham Robert 25 5 7½ New Hampshire Peterborough
scar on left ...

June 15 5644 Myers Lewis 25 5 7 New York New York
scar near left eye & first finger of left hand

Aug 17 5681 Merritt Jas 26 5 3 light Long Island Southold

Sept 18 5692 Merchant Alb 18 5 8 Copper Connecticut Hartford
black hair

Nov 14 5721 Mott Gershom 19 5 6 dark New York New York
scar on back right hand

Dec 16 5740 Moore William 28 5 1¾ dark Connecticut New London
scar on chin & on right eye

26 5746 Morey Hazard 23 5 7¾ Connecticut Norwich

1816
March 18 5770 Mosley Joseph 23 5 3½ light Delaware New Castle
scar on left elbow

May 31 5785 Morris Roswell 19 5 9½ sandy

June 3 5786 Morris Edward 17 5 8 light Connecticut Groton

Dec 20 5835 Miller ... 26 5 4½ light Lyme
scar in left cheek

1817 Jan 20 5838 Monroe William 29 5 5½ Dark New York New York
See on next page Scar on left hand

91

| Date | No. | Name | Age | Height | Complexion | Born | Residence | |
|---|---|---|---|---|---|---|---|---|
| | 3857 | Hayden Peleg | 23 | 5 6¾ | light | " | " | |
| 30 | 3863 | Huntington Roger | 22 | 5 6½ | " | " | Norwich | |
| | | | | | | small scar on right temple vaccinated | | |
| Aug 6 | 3876 | Hicks Cyrus | 18 | 5 10 | " | Vermont | Guilford | |
| | | | | | | right scar on left leg | | |
| 29 | 3900 | Carlshus Andrew | 21 | 5 7½ | dark | Connecticut | Portland | |
| Sep 25 | 3119 | Huntley Samuel | 16 | 5 3 | light | " | Preston | |
| | | | | | | scar on the right wrist | | |
| 27 | 3120 | Holly Abil | 17 | 5 6 | " | " | Gloster | |
| | | | | | | a mark under the right ear | | |
| Oct 11 | 3133 | Huntley Philo | 25 | 5 8 | " | " | Colchester | |
| | | | | | | scar on two first fingers right hand | | |
| 31 | 3956 | Hills Ashbel | 17 | 5 9 | " | " | Hartford | |
| | | | | | | scar on first finger of left hand | | |
| Nov 12 | 3985 | Hart Walt | 19 | 5 8 | | | Ellin | |
| | | | | | | | | |
| | | | | | | | | |
| 15 | 4005 | Hoffman | 28 | 5 5 | | | | |
| 1807 | | | | | | | | |
| 7 | 4000 | | 16 | 5 2½ | | | | |
| 10 | 404 | Hibbar | 17 | 4 | both | | | |
| Apl 28 | 4094 | Hiscox Edward | 46 | 5 11 | " | Rhode Island | Westerly | |
| | 4096 | Hiscox Ephraim | 29 | 5 6 | " | " | " | |
| | | | | | | scar on left cheek | | |
| May 5 | 4121 | Harding Trevillo | 19 | 5 3 | " | Massachusetts | Chatham | |
| | 4129 | Hamilton John | 21 | 5 4½ | | | Blanford | |
| | | | | | | a large scar on left foot | | |
| | 4131 | Hall Thomas | 53 | 5 6¾ | light | Rhode Island | Westerly | |
| 6 | 4138 | Helme Samuel | 26 | 6 | dark | Connecticut | Stonington | |
| | | | | | | a scar over left eye near eye brow | | |
| | 4140 | Hiscox Sumner | 18 | 5 9 | light | Rhode Island | Westerly | |
| 8 | 4152 | Hart Joseph | 22 | 5 6 | dark | Massachusetts | Boston | |
| | | | | | | large scar on right hand scar on right eye | | |
| 11 | 4176 | Hall John | 17 | 5 7 | light | Rhode Island | Hopkinton | |
| | | | | | | scar across left eye brow | | |
| | 4177 | Hill Jonathan Jr | 18 | 5 11 | dark | Connecticut | Montville | |
| | 4179 | Honeywell Elliot | 20 | 5 1 | light | Rhode Island | New Shoreham | |
| 12 | 4186 | Hill Thomas | 23 | 5 9¾ | " | " | Richmond | |
| | 4194 | Hall Stanton | 23 | 6 4 | dark | " | Westerly | |
| 13 | 4199 | Hammond J. James | 17 | 5 3 | light | Massachusetts | Ware | |
| | 4211 | Harrard Abraham | 19 | 5 9 | Indian | Rhode Island | Charlestown | |
| | | | | | | scar on his head | | |
| 14 | 4222 | Howel Benjamin | 22 | 5 7½ | light | New York | River Head | |
| | 4226 | Hide Henry | 18 | 5 7 | " | Rhode Island | Hopkinton | |
| | | | | | | scar on right leg & nature & mark on belly | | |
| 15 | 4230 | Howel John | 23 | 5 4 | " | New York | South Hold | |
| | | | | | | scar on face & one in ankle of left leg | | |
| | 4234 | Hall Arakel | 38 | 5 11 | " | Rhode Island | Hopkinton | |
| | | | | | | large scar on left leg / scar on left thigh | | |

| Date 1798 | No. | Name | Age | Complexion | State | Town | Marks |
|---|---|---|---|---|---|---|---|
| Aug 3n | 1002 | Vail Nath.l | 18 5 6 | light | Connecticut | Guilford | Nativity |
| | 1003 | Vail John | 17 5 10 | " | " | " | " |
| 1799 Dec 19 | 1401 | Van Deursen Benj. | 16 5 1 | Negro | Massachu. | Sandersfield | " |
| 1800 Jan 7 | 1606 | Vallet John Saton | 26 5 10½ | light | Connecticut | Montville | " |
| Feb 19 | 1899 | Vail Jeremiah | 17 5 5 | am | New york | South hold | " |
| 1801 Oct 20 | 2223 | Voshier John | 13 4 9½ | " | " | New york | " |
| Nov 24 | 2243 | Womford Gaylord | 21 5 8½ | " | Connecticut | Chatham | " |
| 1804 May 9 | 2418 | Vail Stephen | 17 5 4 | " | Massachu. | " | " |
| 1798 Dec 24 | 1575 | Thompson Robert | 20 6 | light | R. Island | Westerly | " |
| | 1584 | Thompson Gurdon | 25 5 10¾ | dark | Connecticut | Montville | " |
| 1800 Jan 7 | 1620 | Tift Hazard | 18 5 5 | " | " | Stonington | " |
| 17 | 1625 | Tift Joseph | 17 5 6 | light | " | Groton | " |
| Feb 1 | 1628 | Toffot Charles | 44 5 10 | Negro | " | Wethersfield | " |
| April 5 | 1658 | Tucker Alpheus | 28 5 10 | dark | " | Coventry | " |
| 14 | 1674 | Thomas John | 17 5 6 | light | R. Island | East Greenwich | " |
| May 1 | 1691 | Turner Allyn | 21 5 9 | " | Connecticut | Groton | " |
| 13 | 1706 | Turner Erastus | 19 5 9 | " | " | Mansfield | " |
| June 4 | 1727 | Tubman Samuel | 21 5 6 | " | " | Norwich | " |
| 14 | 1737 | Thon Charles | 15 5 | " | " | Stonington | " |
| Aug 24 | 1812 | Tracy Joshua | 24 5 7 | " | " | Norwich | " |
| Sep 7 | 1811 | Turner James | 19 5 9½ | " | " | Montville | " |
| k | 1815 | Thomas Richard | 24 5 3 | " | Massachu. | Boston | " |
| 10 | 1836 | Thomas William | 17 5 1 | " | New York | N York Scar on Left of right leg | " |
| Oct k | 1855 | Thompson James | 18 5 5 | " | Connecticut | New London | " |
| 7 | 1861 | Tubbs Elisha | 21 5 9 | " | " | Lyme | " |
| Nov 1 | 1897 | Tracy Charles | 17 5 4 | " | " | Preston | " |
| | 1898 | Talcott Henry | 19 5 8 | " | " | Windsor large scar on the hand | " |
| 15 | 1925 | Tucker Clark | 17 5 4 | " | New york | New york dark Eyes | " |
| 28 | 1938 | Thompson Lewis | 19 5 5 | " with dark Eyes | " | Southhampton | " |
| Dec 5 | 1945 | Frank Thomas | 23 5 7½ | dark with Curly hair | Penn.a &c. | Susque hanna | " |
| 30 | 2001 | Thomas Samuel | 36 5 8½ | light | R. Island | Newport | " |
| 1801 Sep 24 | 2022 | Totman Benjamin | 24 5 5½ | " | Massachu. | Barnstable | " |
| Feb 21 | 2013 | Thomas Joshua | 19 5 5 | " | Connecticut | Haddam | " |

A-13

EISNAUGLE, J., concurring with opinion.

I join the majority opinion and agree that the "SEXUAL PREDATOR" designation does not violate Crist's First Amendment rights. I write to emphasize the relative weakness of post-ratification history and to explain that the post-ratification historical evidence currently before us is insufficient by itself to draw any final conclusions about Crist's claim.[1]

When we interpret the constitution "the text controls." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 36 (2022). That said, the United States Supreme Court has made clear that a "regular course of practice" can "liquidate & settle the meaning of" disputed or indeterminate "terms & phrases." *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020) (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819), in 8 *The Writings of James Madison* 450 (Gaillard Hunt ed. 1908)).

But "we must . . . guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. To be sure, "'liquidating' indeterminacies in written laws is far removed from expanding or altering them." *Id.* at 36 (quoting *Gamble v. United States*, 587 U.S. 678, 721 (2019) (Thomas, J., concurring)). Thus, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

While post-ratification history often has a role to play—the role is limited. Indeed, a court's consideration of post-ratification history is "secondary," and at least where other evidence is

---

[1] I join the majority opinion in full because, as I read it, the analysis is consistent with the limitations on post-ratification history.

available, is used merely as confirmation. *Id.* at 37. For instance, in *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008), the Supreme Court turned to post-ratification history "only after surveying . . . a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." *Gamble*, 587 U.S. at 702 (analyzing *Heller*).

In this case, we might be missing the strongest pieces of the puzzle. Given the lack of briefing, and the limits on our own research, we cannot be certain we have the full picture of historical evidence, and importantly, we do not have the benefit of any substantial pre-ratification history to help frame the post-ratification discussion in section V.[2] Without knowing whether—and to what extent—any substantial pre-ratification history exists, the most we can fairly conclude is that the historic evidence currently before us does not support Crist's claim.

PRATT, J., concurs.

---

[2] I recognize that the date we look to for ratification has not been decided with finality. The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. In *Bruen*, although the Court recognized an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," *id.*, it did not decide the issue. For purposes of this opinion, I follow the Supreme Court's lead and assume the scope of the Free Speech Clause "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*

KILBANE, J., concurring.

I agree with the majority that the "SEXUAL PREDATOR" driver license designation does not violate Crist's free speech rights. I write separately to explain the designation contains only government speech critical to Florida's essential government operations, and thus Crist cannot set forth a First Amendment claim.

In assessing whether the designation is government speech, we "conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *See Shurtleff v. City of Boston*, 596 U.S. 243, 252 (2022); *see also id.* at 262 (Alito, J., concurring) (noting the "real question in government-speech cases" is "whether the government is *speaking* instead of regulating private expression").

For more than eighty-five years, the State of Florida has issued driver licenses as part of its essential governmental operations.[1] *See Department History*, Florida Highway Safety

---

[1] At first, the issuance of driver licenses in Florida was governed by city ordinances. *See, e.g., State v. Dillon*, 89 So. 558, 559 (Fla. 1921) ("[T]he city of Miami has the right to require the drivers of all automobiles for hire using the public streets of the city, to obtain a license from the city, and in the interest of public safety, it may inquire into and decide upon the qualification and fitness of persons to operate auto cars."). In 1939, however, the Florida Legislature created the Department of Public Safety and delegated its authority over *state* licensing. *See Shadler v. State*, 761 So. 2d 279, 283 n.3 (Fla. 2000); *see also State ex rel. Nelson v. Quigg*, 196 So. 417, 417 (Fla. 1940) ("Chapter 19551 of the Laws of Florida, Acts of 1939, prohibits any person from driving an automobile on the highways of the State unless he has a license to do so."). In 1969, the Department of Public Safety and the Department of Motor Vehicles merged to form the newly created Department of Highway Safety and Motor Vehicles

and Motor Vehicles, https://www.flhsmv.gov/about/department-history/ (last visited July 29, 2025); *see also Shadler v. State*, 761 So. 2d 279, 283 n.3 (Fla. 2000); § 322.263(1), (3), Fla. Stat. (2019) (codifying legislature's purpose to "[p]rovide maximum safety for all persons who travel or otherwise use the public highways of the state" and "[d]iscourage repetition of criminal action by individuals against the peace and dignity of the state"). In 2007, Florida began placing a designated marking on licenses of convicted sexual predators.[2] *See* § 322.141(3)(a), Fla. Stat. (2007). It is this designation that Crist asserts he is compelled to convey in violation of the Free Speech Clause of the First Amendment.

Since their inception, Florida state driver licenses have been exclusively issued by a government agency, used to communicate essential information in the interest of public safety, and strictly regulated by the State.[3] *See Department History*, *supra; see*

---

("Department"), which was delegated authority over driver license administration and enforcement. *See Department History*, Florida Highway Safety and Motor Vehicles, https://www.flhsmv.gov/about/departmenthistory/ (last visited July 29, 2025)*; Shadler*, 761 So. 2d at 283 n.3. The Department continues to issue licenses for the State of Florida today. *See* § 322.02(2), Fla. Stat. (2019).

2 Initially, Florida adopted a driver license designation for sexual predators that merely referenced The Florida Sexual Predators Act as follows: "775.21, F.S." *See* § 322.141(3)(a), Fla. Stat. (2007). Seven years later, the designation was changed to the current marking: "SEXUAL PREDATOR." *See* § 322.141, Fla. Stat. (2014).

3 Despite being placed in a licensee's possession, the State maintains stringent control over the license. *See, e.g.*, § 322.15(1), Fla. Stat. (2019) ("Every licensee shall have his or her driver license, which must be fully legible with no portion of such license faded, altered, mutilated, or defaced, in his or her immediate possession at all times when operating a motor vehicle and shall present or submit the same upon the demand of a law enforcement officer or an authorized representative of the department."). Given the State's broad authority to issue,

*generally* ch. 322. Even where a license contains an individual's self-reported information[4] or an optional designation from government-selected choices, the speech displayed on the license is ultimately compiled and controlled by the State. *Cf. Little v. Llano County*, 138 F.4th 834, 865 (5th Cir. 2025) ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024))); *id.* at 852 ("[T]he Supreme Court has held that the speaker is the one who selects, compiles, and presents." (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995))); *cf. id.* at 865 (applying the *Shurtleff* factors to find library's curated collection constituted government speech).

Taking a holistic view, the information shown on a Florida driver license is, in its entirety, spoken by the State.[5] Thus, the

regulate, seize, suspend, and revoke driver licenses, it follows that the physical license is government speech expressed on government property. *See, e.g., id.* §§ 322.059 (authorizing law enforcement to seize driver licenses where an individual fails to return it upon suspension), .22 (authorizing state agency to cancel or refuse to issue or renew a license in some cases; requiring licensee to surrender the license); *cf. Doe v. Kerry*, No. 16-CV-0654-PJH, 2016 WL 5339804, at *17 (N.D. Cal. Sept. 23, 2016) ("Passports remain government property even when held by individuals, and must be surrendered to the U.S. government upon demand.").

4 In applying for a driver license, an individual must provide certain information and swear or affirm the statements are truthful. *See* § 322.08(1), Fla. Stat.

5 This is consistent with the unanimous holding of all courts that have undertaken this issue other than the original panel majority in this case. *See Corbitt v. Sec'y of the Ala. Law Enf't Ag.*, 115 F.4th 1335, 1352 (11th Cir. 2024) ("[A]ny speech on an Alabama driver's license . . . is government speech."); *State v. Hill*, 341 So. 3d 539, 552 (La. 2020) (recognizing "an identification card is government speech"); *Nelson v. Landry*, 714 F. Supp. 3d 790, 804 (M.D. La. 2024) (same); *Doe 1 v. Marshall*, 367 F. Supp.

36

sexual predator designation portion of the license—which is based on a status imposed only after adjudication by our adversarial system—is certainly government speech,[6] and not itself subject to the Free Speech Clause.[7] *See Walker v. Texas Div., Sons of Confederate Vets., Inc.*, 576 U.S. 200, 212 (2015) ("Consequently, 'persons who observe' designs on IDs 'routinely—and reasonably—interpret them as conveying some message on the [issuer's] behalf.'" (alteration in original) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 471 (2009))); *id.* at 215 ("Because the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply."); *Summum*, 555 U.S. at 467 ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny." (alteration in original) (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005))).

The clear answer to the government speech issue lays the foundation for the compelled speech question here. Even pure government speech must be reviewed to determine whether the means of conveyance unlawfully compels private speech. *See Shurtleff*, 596 U.S. at 269 ("[G]overnment speech in the literal sense is not exempt from First Amendment attack if it uses a means that restricts private expression in a way that 'abridges'

_____

3d 1310, 1325 (M.D. Ala. 2019) ("The message here is indeed government speech. After all, the State issues the ID cards and controls what is printed on them."); *cf. Kerry*, 2016 WL 5339804, at *16 (finding U.S. passports are "unquestionably government speech"). *But see Crist v. State*, No. 5D2022-2966, 50 Fla. L. Weekly D177 (Fla. 5th DCA Jan. 10, 2025), *vacated on reh'g en banc*.

6  That this mandatorily imposed designation constitutes government speech is even more clear than in cases where a plaintiff *sought* to alter a license designation. *See, e.g.*, *Corbitt*, 115 F.4th at 1352.

7  Government speech is, of course, subject to the *Establishment Clause* of the First Amendment. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009). This is not further addressed as it is not relevant here.

37

the freedom of speech, as is the case with compelled speech."). But Crist must first establish his interests implicate First Amendment protections. *See Wooley v. Maynard*, 430 U.S. 705, 716 (1977); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008) ("[T]o address a claim that a state action violates the right not to speak, a court first determines whether the action implicates First Amendment protections. *If it does*, the court must determine whether the action is narrowly tailored to serve a compelling state interest." (emphasis added) (internal citations omitted) (citing *Wooley*, 430 U.S. at 716)).

Long before *Wooley*, Justice Murphy summarized the complementary rights of speech and silence as follows: "The right of freedom of thought . . . as guaranteed by the Constitution against State action includes both the right to speak freely and the right to refrain from speaking at all, except in so far as essential operations of government may require it for the preservation of an orderly society[.]" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring); *see also United States v. Arnold*, 740 F.3d 1032, 1035 (5th Cir. 2014) ("[T]here is no right to refrain from speaking when 'essential operations of government require it for the preservation of an orderly society[.]'" (quoting *United States v. Sindel,* 53 F.3d 874, 878 (8th Cir. 1995))). This exception has been applied to sex offender registration and notification requirements. *See, e.g.*, *Arnold*, 740 F.3d at 1035; *see also Martin v. Hayes*, No. 2:24-CV-3-FL-KS, 2025 WL 634833, at \*6 (E.D.N.C. Jan. 17, 2025) ("Courts have found that sex offender registration requirements are *not* compelled speech because there is no right to refrain from speaking when the government is conducting essential operations to preserve an orderly society." (emphasis added)), *report and recommendation adopted,* No. 2:24-CV-3-FL, 2025 WL 785216 (E.D.N.C. Mar. 12, 2025).

Florida requires the placement of the designation at issue in conducting its "essential government operations" regarding public safety, as part of its overarching sexual predator[8]

---

8  Given the severity of the crimes committed in acquiring sexual *predator* status, and the lack of cases addressing it, cases

registration and notification requirements. When an individual with sexual predator status is living in the community—i.e., not incarcerated—he or she must obtain, if qualified, either an identification card or driver license with the sexual predator designation within 48 hours of registration. *See* § 775.21(6)(f), Fla. Stat.; *see also id.* § 322.141(3). This is due to "[t]he high level of threat that a sexual predator presents to the public safety, and the long-term effects suffered by victims of sex offenses[.]" *Id.* § 775.21(3)(b)(3); *see also id.* § 775.21(3)(d) ("The state has a compelling interest in protecting the public from sexual predators and in protecting children from predatory sexual activity, and *there is sufficient justification for requiring sexual predators to register and for requiring community and public notification of the presence of sexual predators.*" (emphasis added)). The determination of the need for and placement of this designation, to notify the community and keep it safe from predatory behavior, is not only within the sole control of the government, but what we, as a society, have always expected of it. *Cf. Smith v. Doe*, 538 U.S. 84, 101 (2003) ("The State makes the facts underlying the offenses and the resulting convictions accessible so members of the public can take the precautions they deem necessary before dealing with the registrant."); *see also Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 26 (1905) ("[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good."); St. Thomas Aquinas, *Summa Theologiae*, pt. 1, question 90, art.

---

addressing designations for sex *offenders* are somewhat instructive but less persuasive. *See Hill*, 341 So. 3d at 555 (addressing law requiring individual to carry identification branded with "sex offender"); *Marshall*, 367 F. Supp. 3d at 1318 ("An offender's driver's license is branded with 'CRIMINAL SEX OFFENDER' in bold, red letters."); *see also Marshall*, 367 F. Supp. 3d at 1327 n.4 ("Florida divides offenders into categories: most have a code ('943.0435, F.S.') on their ID, while a 'sexual predator' label is used for the most serious offenders.").

2, https://www.newadvent.org/summa/2090.htm ("[E]very law is ordained to the common good.").

Undoubtedly, the designation at issue will never be requested or desired to be shared by any individual.[9] Instead, this status may be affixed only as a result of the violation of a law

9 It should be noted that Crist is not being asked to convey a message with which he *disagrees* but instead challenges being compelled to convey this information to the public himself. *Contra Full Value Adviss., LLC v. S.E.C.*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) ("First Amendment concerns are paramount when the Government compels a speaker to endorse a position contrary to his beliefs, or to 'affirm[] a belief and an attitude of mind' he opposes." (alteration in original) (quoting *Barnette*, 319 U.S. at 633))). *But see Marshall*, 367 F. Supp. 3d at 1325 ("Plaintiffs *do not* agree that they are 'criminal sex offenders.'" (emphasis added)). In the face of the government's need to publicize sexual predator status in the community, this is not enough. *Cf. Cressman v. Thompson*, 798 F.3d 938, 963 (10th Cir. 2015) ("[M]erely objecting to the fact that the government has required speech is not enough; instead, a party must allege some disagreement with the viewpoint conveyed by this speech.").

This case is distinguishable from *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988), in which the Supreme Court found a First Amendment violation where professional fundraisers were compelled to disclose the amount of charitable contributions that were actually provided to a charity before appealing for funds from potential donors. In *Riley*, the Court found a free speech violation may exist in either compelled statements of opinion or *fact*. *Id.* at 797–98. That said, *Riley* did not concern the expression of a public fact—such as a conviction—related to an essential government operation, but rather a law compelling a private individual to speak a private fact. *Cf. Smith*, 538 U.S. at 101 ("Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record.").

40

drafted, debated, and passed by the legislative branch; signed into law by the executive branch (i.e., the Florida Governor); and adjudicated by the judicial branch. *See* Art. III, §§ 7, 8(a), Fla. Const.; *id*. Art. VI § 1. After being convicted through the adversarial process, this collateral consequence appears on the face of the predator's government identification. *See* § 775.21(3)(d), Fla. Stat. ("The designation of a person as a sexual predator is neither a sentence nor a punishment but simply a status resulting from the conviction of certain crimes."); *see also Smith*, 538 U.S. at 98 ("Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment.").

Crist's designation informs those for whom he voluntarily or mandatorily presents his license[10] that he has been convicted of a crime the government found necessary to publicize for public safety. *See* § 775.21(3)(b)4.–5., Fla. Stat. (noting state strategy includes "registration of sexual predators, with a requirement that complete and accurate information be maintained and accessible for use by law enforcement authorities, communities, and the public" and "community and public notification concerning the presence of sexual predators"); *cf. Fletcher v. State*, 699 So. 2d 346, 347 (Fla. 5th DCA 1997) ("Courts are almost universal in recognizing that registration requirements for sexual predators are designed to enable the public to protect itself from dangers posed by sexual predators who are widely regarded as having high risks of recidivism."). Thus, a convicted sexual predator cannot refrain from speaking if awareness of his

---

10 Because driver licenses are government property merely in the possession of an individual, this case is also distinguishable from compelled speech cases where an individual was obligated to exhibit a government message on his or her *private* property. *See, e.g.*, *Wooley*, 430 U.S. at 713 (holding the State cannot compel an individual to display a government message on his *private property* for public consumption); *McClendon v. Long*, 22 F.4th 1330, 1340 (11th Cir. 2022) ("The Sheriff's warning sign impermissibly burdens his First Amendment right to be free from being forced to host a government message *on his private property*.").

predator status is *essential* to the preservation of "an orderly society." *Barnette*, 319 U.S. at 645 (Murphy, J., concurring).

Crist having to produce his license with a sexual predator designation does not involve the "individual freedom of mind" contemplated by the Free Speech Clause, *see Wooley*, 430 U.S. at 714, but instead provides an example of government speech that does not implicate First Amendment protection because its sole purpose is necessary for *essential* state operations. *Cf. Arnold,* 740 F.3d at 1035 (finding no compelled speech claim arises from sex offender registration and notification requirements because they are born of "essential operations of the government"); *Martin*, 2025 WL 634833, at *6 (finding no compelled speech in requiring photo "in furtherance of North Carolina's essential operation" of sex offender registry); *Does v. Whitmer*, 751 F. Supp. 3d 761, 826 (E.D. Mich. 2024) (holding sex offender registry reporting requirements in furtherance of State's essential operations did not implicate First Amendment protections).

EDWARDS, J., concurs.

SOUD, J., concurring in result with opinion.

Nine members of this Court, sitting en banc, rightly recede from the majority panel opinion previously delivered in this case and, in so doing, substantively agree with the conclusions I reached in my dissent thereto. As a result, I concur with the en banc majority's decision—which affirms the trial court's denial of Appellant Michael Crist's motion to dismiss the charges against him and upholds as constitutional sections 322.212(5)(c) and 322.141(3)(a), Florida Statutes. And I do so for the reasons first discussed in my then-dissenting opinion, which focused on the legal issues and precedent argued both to us and below.

Simply stated, this Court makes clear that it remains constitutional for the People of Florida to require a convicted sexual predator such as Crist to have his state-issued Florida driver license marked with the words "SEXUAL PREDATOR" as one means of protecting vulnerable children from those who may desire to sexually abuse them.

## I.

In 2001, Michael Crist was charged in Sumter County, Florida with three counts of capital sexual battery and two counts of first-degree lewd or lascivious molestation. Thereafter, Crist was allowed to enter a plea agreement by which he pleaded guilty to lesser included offenses: three counts of attempted sexual battery upon a person less than 12 years of age and two counts of second-degree lewd or lascivious molestation. By his plea, Crist admitted his guilt and acknowledged that the child victim was "truthful" concerning the allegations and that, subsequent to the charged conduct, Crist invited the child victim to his home "intend[ing] to again engage in sexual acts with that child." Crist also acknowledged that another minor child "who first brought [his] criminal actions to light concerning the [young male] child victim in the pending case has been truthful concerning [Crist's] sexual overtures toward her."

43

The crimes Crist inflicted upon his less-than-12-year-old victim during a five-month period are horrific in every way. Ultimately, in accordance with the terms of the plea, Crist was designated a sexual predator and sentenced to 8 years in prison followed by 17 years of sex-offender probation.

Upon release from prison, Crist began serving the sex-offender probation portion of his sentence. By operation of section 322.141(3)(a), Florida Statutes, Crist's Florida driver license was to bear the marking "SEXUAL PREDATOR." While Crist was on probation, a law enforcement officer went to Crist's residence to conduct a registration check and verify his current address. When Crist was asked for his identification, the law enforcement officer observed Crist "picking" at the license while he delayed giving it to the officer. Based on the officer's experience, he believed Crist was trying to remove a sticker from his license that concealed the "SEXUAL PREDATOR" marking. When the officer was able to obtain Crist's license, he observed a smiley face sticker covering the statutorily required marking. Crist was arrested.

Crist was charged with violation of section 322.212(5)(c), Florida Statutes, and attempted tampering with evidence. As a result of these charges, he also was alleged to have violated his probation. Crist filed his motion asking the trial court to declare sections 322.212(5)(c) and 322.141(3)(a) unconstitutional. Crist argued that the required "SEXUAL PREDATOR" marking on his driver license compels his speech, in violation of the First Amendment to the United States Constitution.

The trial court denied the motion. Thereafter, Crist entered an admission of violation of probation and related plea agreement to the new charges, reserving the right to appeal the denial of his motion. Crist was sentenced to 295 months in prison for violation of his probation (just more than 24.5 years). He also was sentenced to concurrent terms of five years in prison on each of his two new crimes. This appeal followed.

## II.

Florida statutes are cloaked with a "strong presumption" in Florida law that they are constitutional. *Montgomery v. State*, 69 So. 3d 1023, 1026 (Fla. 5th DCA 2011) (citing *DuFresne v. State,*

826 So. 2d 272, 274 (Fla. 2002); *Adhin v. First Horizon Home Loans*, 44 So. 3d 1245, 1250 (Fla. 5th DCA 2010)). "It is a fundamental principle of our constitutional jurisprudence that all doubts as to the validity of a statute are to be resolved in favor of constitutionality where reasonably possible." *Westerheide v. State*, 767 So. 2d 637, 647 (Fla. 5th DCA 2000), *approved*, 831 So. 2d 93 (Fla. 2002) (internal quotation marks omitted). This presumed constitutionality endures until the contrary is shown. *Id.* Thus, one who challenges a statute's constitutionality shoulders "a heavy burden of establishing its invalidity." *Montgomery*, 69 So. 3d at 1026 (citing *Wright v. State,* 739 So. 2d 1230, 1231 (Fla. 1st DCA 1999)).

## A.

The Florida Sexual Predators Act, found in section 775.21, Florida Statutes, governs those who have been convicted of qualifying sexual offenses set forth therein. *See* § 775.21(4)(a), Fla. Stat. To serve the State of Florida's "compelling interest in protecting the public from sexual predators and in protecting children from predatory sexual activity," § 775.21(3)(c), Fla. Stat., the Act requires that all individuals convicted of qualifying offenses shall, at the time of sentencing, be designated a "sexual predator," § 775.21(5), Fla. Stat. The convicted sexual predator also is subjected to, *inter alia*, registration requirements, *see* § 775.21(6), Fla. Stat., and public-notification procedures, *see* § 775.21(7), Fla. Stat.

Further, a Florida driver license or identification card issued to a designated sexual predator "shall have on the front of the license or identification card . . . the marking 'SEXUAL PREDATOR.'" § 322.141(3)(a), Fla. Stat. If the designated sexual predator fails to display or alters this required marking on the driver license issued to him, he commits a third-degree felony. *See* § 322.212(5)(c), (6), Fla. Stat.

## B.

Crist argues that the "SEXUAL PREDATOR" marking on the driver license issued to him by the Florida Department of Highway Safety and Motor Vehicles is unconstitutional because it compels

45

his speech in violation of the First Amendment to the United States Constitution. His argument fails.

To determine the constitutionality of sections 322.141(3)(a) and 322.212(5)(c), we must resolve two issues. First, does the statutorily required "SEXUAL PREDATOR" marking now placed upon the Florida driver license issued to Crist compel *his* speech? Finally, if so, does such compelled speech violate the First Amendment to the United States Constitution?

In my view, the answer to the first question is no—the required marking does not compel Crist's speech. Further, assuming *arguendo* such marking did compel Crist's speech, the answer to the second question also is no—the required marking does not violate the First Amendment.

1.

The statutorily required "SEXUAL PREDATOR" marking on Crist's driver license does not compel speech *by Crist*. Rather, it is the government of the State of Florida that speaks.

Government speech has been described as speech by the government in furtherance of its purposes or programs. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 232 (2015) (Alito, J., dissenting). And when the government chooses to speak, it does not trigger First Amendment safeguards. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (citing *Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny.")); *see also Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."). Generally, a government entity has the right to "speak for itself." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000). When the government chooses to speak, "it is entitled to say what it wishes." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 833 (1995).[1] And when

---

[1] As Justice Alito, writing for the Court, further explained in *Pleasant Grove City*, "[t]his does not mean that there are no

46

government does so, "it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Southworth*, 529 U.S. at 235.

While it is true that the government has the right to speak, it does not have the right to compel Crist to disseminate its message. Here, however, the State has not spoken through Crist. Rather, it speaks through its own, duly issued document—a Florida driver license.

Pertinent here, the First Amendment to the United States Constitution provides, "Congress shall make no law . . . abridging the freedom of speech." Amend. I, U.S. Const. The United States Supreme Court, in interpreting the First Amendment, has determined that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Id.* (citation omitted). The Supreme Court has further concluded that the "compelled speech doctrine applies to ideological speech and purely factual, non-commercial speech." *McClendon v. Long*, 22 F.4th 1330, 1336 (11th Cir. 2022) (citing *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 797–98 (1988); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767–71 (2018)).

Crist relies primarily on two cases in support of his position that the challenged statutes are unconstitutional: *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310 (M.D. Ala. 2019), and *State v. Hill*, 341 So. 3d 539 (La. 2020). Those cases conclude that each state's similar laws requiring markings on the driver licenses held by those who have committed sexual crimes impermissibly compelled

---

restraints on government speech. For example, government speech must comport with the Establishment Clause." 555 U.S. at 468; *see also Van Orden v. Perry*, 545 U.S. 677, 692–98 (2005) (Thomas, J., concurring) (discussing the original meaning of the Establishment Clause).

47

the offender's speech in violation of the First Amendment. Both cases are devoid of any persuasive force or effect.

Nearly fifty years ago, the United States Supreme Court in *Wooley* declared unconstitutional New Hampshire's punishment of a citizen for covering the State motto "Live Free or Die" on his license plate affixed to his personal automobile. *Wooley*, 430 U.S. at 717. The Court held it was violative of the First Amendment to "require an individual to participate in the dissemination of an ideological message by *displaying it on his private property* in a manner and for the express purpose that it be *observed and read by the public*." *Id.* at 713 (emphasis added). To allow the state to do so would "in effect require[] that appellees use their private property as a 'mobile billboard' for the State's ideological message or suffer a penalty." *Id.* at 715; *see also McClendon*, 22 F.4th at 1336 (citing *Wooley*). Such action "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *see also Wooley,* 430 U.S. at 715.

The "SEXUAL PREDATOR" marking on Crist's license materially differs from *Wooley* in two important ways. First, the marking is not displayed on Crist's private, personal property. Second, the required marking is not placed on the driver license "for the express purpose that it be *observed and read by the public*" at large. *See Wooley*, 430 U.S. at 713 (emphasis added).

a.

Simply stated, Florida Statutes clearly provide that which is self-evident—a Florida driver license is a government-issued certificate by which the State communicates certain information set forth by statute. And much like a U.S. passport, a Florida driver license remains government property and, when issued by the State and placed in Crist's possession, does not constitute Crist's personally owned private property. *See Doe v. Kerry*, No. 16-cv-0654-PJH, 2016 WL 5339804, at *17 (N.D. Cal. Sept. 23, 2016) (a U.S. passport "remain[s] government property even when held by individuals" and may constitutionally bear an identifier notifying those who view the passport that the holder is a convicted sex offender).

More specifically, a Florida driver license is "a certificate that, subject to all other requirements of law, authorizes an individual to drive a motor vehicle." § 322.01(17), Fla. Stat. The driver license is issued *only* by the Florida Department of Highway Safety and Motor Vehicles. *See* § 322.14(1)(a), Fla. Stat. And Florida law grants to the department the right to require the surrender of the driver license upon certain occurrences. *See, e.g.*, § 322.059, Fla. Stat. (surrender of license required for delinquent support obligation); § 322.22, Fla. Stat. (authorizing cancelation or withholding of issuance or renewal of license and requiring surrender of canceled license).

The holder of a Florida driver license, such as Crist, possesses no "editorial control" over what information is contained on the license. No Floridian can add a statement to an officially issued license that may express the holder's personal view or opinion.[2] Indeed, the State of Florida *alone* determines what information is displayed on a driver license. Florida law dictates—in considerable detail—what information is set forth on the license, including, *inter alia*: a color photograph or digital image of the licensee; the name of the State; a unique number assigned to the licensee; the licensee's full name, date of birth, and residential address; a description of the licensee, to include his sex and height; and the dates of issuance and expiration of the license. A license is also required to be signed by the licensee and identify the class of vehicle he may operate. *See* § 322.14(1), Fla. Stat.; *see also* § 322.141, Fla. Stat. (providing additional requirements). The holder of the license has no prerogative to request or require the removal of this information beyond that contemplated by Florida law.

Further, the State of Florida exerts considerable control over the physical license itself. Specifically, Florida law provides:

> *Every licensee* shall have his or her driver license, which must be *fully legible with no portion of such license faded, altered, mutilated, or defaced*, in his

---

[2] To permit the holder of a Florida driver license to add to or alter its contents based on the whim or preference of the holder would diminish the license as a means of government-issued identification.

49

or her immediate possession at all times when operating a motor vehicle and shall present or submit the same upon the demand of a law enforcement officer or an authorized representative of the department.

§ 322.15(1), Fla. Stat. (emphasis added). As such, although the driver license is tendered by the State into Crist's possession, the license retains its character as a government "certificate," *see* § 322.01(17), Fla. Stat., over which the government continues to maintain ownership and statutory control.

It is that certificate—that license issued by the Florida Department of Highway Safety and Motor Vehicles—that conveys the State's message identifying Crist's *legal status* as a "SEXUAL PREDATOR." Such *legal status* is born from the designation Florida law placed upon him as a result of his conviction for his admitted and horrendous sexual offenses perpetrated against his minor child victim. He did not choose the classification, and one can rightly conclude he would discard the status if allowed. Nonetheless, Florida law requires Crist be designated a sexual predator and that the Department identify Crist as a convicted sexual predator on his state-issued driver license.

As a result, both the substance of the communication—Crist's *legal status* as a sexual predator, which is pertinent to his legal identity—and the means of communication—the driver license issued by the State of Florida to Crist that contains all information required by law—are quintessential government speech. The State's communication of Crist's *legal status* as a dangerous sexual predator is purely governmental speech spoken through a purely governmental medium. And the State is permitted to communicate Crist's *legal status* in furtherance of its purpose to protect the community and children in Florida.

That Crist has possession of the driver license, and exercises a degree of concurrent physical control over it, does not render the license "his property." *See Kerry*, 2016 WL 5339804, at *17 ("Passports remain government property even when held by individuals . . . ."). And because the State's message communicating Crist's status as a sexual predator is not communicated through use of Crist's private property—as was the

case in *Wooley* and *McClendon*—the State has not impermissibly compelled Crist's speech.

b.

Additionally, the driver license here is distinguishable from the license plate in *Wooley* because the required marking is not placed on the driver license "for the express purpose that it be *observed and read by the public.*" *See Wooley*, 430 U.S. at 713 (emphasis added). The compelled distribution of the government speech at issue in *Wooley* (a license plate attached to one's vehicle) and *McClendon* (a yard sign placed by a local sheriff's office at the residences of registered sex offenders warning passersby not to trick or treat at the home) involved distribution by displaying the message on one's private property that would be observed and read by all passersby. *See Wooley,* 430 U.S. at 713; *McClendon*, 22 F.4th at 1336–38.

Far different than *Wooley* and *McClendon*, the "SEXUAL PREDATOR" marking is not placed on Crist's driver license as a "billboard," *see Wooley*, 430 U.S. at 715, designed to be a message communicated to the public at large and consumed by them. By its very nature, a driver license customarily is held in one's wallet (or the like) along with other items needed for business or personal purposes. Unlike a license plate or sign, it is not displayed to all who pass by or encounter its holder. Rather, it is a means of official identification (and certificate of authority to operate a motor vehicle on public roadways) that is shown when required or requested. Those who may request to view the license may be law enforcement or other governmental agents, as well as private individuals in business settings. Such request is born of situational need. And it is not difficult to envision such need extending beyond Crist encountering law enforcement officers and into business settings, including those environments where children regularly congregate (e.g., playground-type establishments, cruises, places where adults may volunteer to work with children, etc.). Thus, the purpose of the marking is to notify such persons who have reason to view the driver license in seeking to identify an individual and receive other information contained on the license (perhaps including his designation as a sexual predator).

2.

Even if, *arguendo*, the statutorily required "SEXUAL PREDATOR" marking constitutes a form of compelled speech by Crist, the statutes requiring the marking and forbidding its alteration or concealment are constitutional under the First Amendment and binding United States Supreme Court precedent.

As the Eleventh Circuit has explained, "[w]hen the government 'compel[s] speakers to utter or distribute speech bearing a particular message,'. . . such a policy imposes a content-based burden on speech and is subject to strict-scrutiny review." *McClendon*, 22 F.4th at 1337–38 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–42 (1994)) (other citations omitted). Thus, to be constitutionally permissible, the challenged speech "must be a narrowly tailored means of serving a compelling state interest." *Id.* at 1338 (citing *Pacific Gas & Elec. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 19 (1986)). The SEXUAL PREDATOR marking before us passes constitutional muster.

The inherently compelling state interest in protecting the public and minor children from sexual offenses, *see* § 775.21(3)(c), Fla. Stat., is self-evident and in need of no commentary. This interest is universally—and rightly—regarded as sufficiently compelling for constitutional purposes, including by the courts relied upon by Crist. *See Doe 1*, 367 F. Supp. 3d at 1329; *Hill*, 341 So. 3d at 553; *see also McClendon*, 22 F.4th at 1338.

Additionally, the challenged statutes are sufficiently narrowly tailored to serve this compelling state interest.[3] The statutorily required marking on Crist's license does not seek to communicate to the public at large or to disinterested passersby. Rather, the marking is viewed only by those who need or desire to view his license for a given purpose. Those who seek to review Crist's driver

---

[3] As noted by the Eleventh Circuit in *McClendon*, "'narrowly tailored' does not mean 'perfectly tailored.'" 22 F.4th at 1338 (citing *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015)). The statutory marking objected to here is constitutional, and the State of Florida has no burden to further tailor the marking to meet Crist's preference.

license—be they law enforcement authorities or individuals engaged in business or social enterprise—may well need or want to know of Crist's status as a sexual predator. The marking on his license to provide such awareness is narrowly tailored to accommodate this compelling state interest. Any humiliation Crist claims he suffers when required to produce his driver license neither lessens the State's interest nor renders the State's means in this regard insufficiently narrowly tailored.

As a result of his arguments, Crist asks this Court to "at least *change* the requirement of the sexual predator designation on ID cards and driver licenses to those required" of sexual offenders. We have rightly declined this invitation.

First, Crist's suggestion fails to appreciate the unique and heightened risks posed by such predators. True, sexual offenders are themselves serious threats to the public safety. Sexual predators, however, present an even greater threat to the community given the nature of their offenses and the targeting of vulnerable children. Perhaps the requirements of Florida statutes—that a sexual offender be identified on his driver license by statute section number, *see* § 322.141(3)(b), Fla. Stat., while a sexual predator is to be identified by express wording—were enacted into Florida law to appreciate and address that heightened risk and give notification consistent therewith (along with the substantial registration and monitoring requirements also applicable).

Further still, Crist presents no colorable basis for the suggestion that statute numbers pass constitutional muster while the words "SEXUAL PREDATOR" do not. In an apparent effort to assuage the shame he purportedly feels by the overt designation on the driver license,[4] the effect of Crist's suggestion is to lessen

---

[4] Public sunlight may well cause Crist a sense of shame for the repeated and abhorrent acts of abuse he perpetrated on his victim in the darkness of isolation. So be it. Such a proper feeling in no way renders the statutorily required marking on his license unconstitutional.

the ability of the public to know of the threat presented by predators in their presence.

Finally, and more importantly, however, Crist's request—on a most fundamental level—misunderstands the prerogative and purpose of the judicial branch of government. This Court has rightly refused to go along.

Courts may not, even in a rare instance when a statute is declared unconstitutional, rewrite the law. Such is the sole prerogative of the political branches of government, administered by individuals duly elected by the People. To even entertain a contrary notion is violative of the most foundational aspects of government in our Republic and inconsistent with the text, structure, and history of our governing constitution. *See* Art. II, § 3, Fla. Const. ("The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."); *see also* Arts. I–III, U.S. Const.

## III.

As sections 322.212(5)(c) and 322.141(3)(a), Florida Statutes, are plainly constitutional and do not violate Crist's right to speech secured by the First Amendment, the trial court correctly denied his motion.

MAKAR, J., concurring in part, dissenting in part.

The original three-judge panel in this case, on which I served, was presented by the parties with a limited but important legal issue: whether the SEXUAL PREDATOR designation on Florida driver licenses and identification cards is unconstitutional under the compelled speech doctrine, which prohibits the government from forcing individuals from being associated with information that they do not wish to convey. The premier example of the doctrine is the United State Supreme Court's decision involving New Hampshire's state's motto ("Live Free or Die") on motor vehicle license tags, which it held was unconstitutional because it compelled speech with which the vehicle's owner disagreed. *See Wooley v. Maynard*, 430 U.S. 705, 716–17 (1977).

Due to the importance of the issue, the panel ordered oral argument and asked the parties to be prepared to discuss the type and scope of judicial test to be applied to determine the constitutional question. At oral argument, the State conceded that the compelled speech analysis of *Wooley* applied; it argued in its brief only that the SEXUAL PREDATOR designation was the least restrictive means of advancing the government's compelling interest in protecting the public. The State further conceded that it had not raised any other substantive issues in its answer brief, including a claim—first raised at oral argument—that Florida driver licenses are government speech that is immune from First Amendment scrutiny.

After much internal discussion, the panel majority decided the issue the parties presented, ruling—consistent with all existing precedent—that the SEXUAL PREDATOR designation on a driver license was unconstitutional because, although it advanced a compelling government interest (protecting the public), it did not do so in the least restrictive way (leaving it to the legislature to do so). The panel majority followed as persuasive the only cases nationwide that involved sexual predator designations on driver licenses, both of which applied

*Wooley*. The weight of precedent was on Crist's side, from the United States Supreme Court's decision in *Wooley* on down to the Louisiana and Alabama courts, which adopted the analytical framework of *Wooley* and held that a person's driver license, even one containing government speech, must meet the compelled speech test under the Constitution; neither court is a haven of left-leaning judges. *See generally* Wayne A. Logan, *Governmental Authority to Compel the Carrying of Stigmatizing Documents*, 20 Stan. J. Civ. Rts. & Civ. Liberties 220, 221 (Sept. 2024) ("To date, the few courts addressing challenges have condoned branding in principle, yet required less graphic signifiers, based on First Amendment government-compelled speech grounds.").

We certified a question of great public importance and withheld the mandate, which allowed the statute to continue operating while our supreme court considered whether to exercise jurisdiction to decide the matter conclusively.

The en banc opinion, however, bears little resemblance to the limited legal issue the parties briefed and argued to our three-judge panel. To the contrary, it is a judicially spawned intramural creation of its own making. Rather than address and adjudicate the sole issue the parties presented to the panel, the en banc court injected wholly new issues and a legal analysis that no party presented.

The party presentation principle says an appellate court should generally decide only those legal issues presented to it by the parties. *See Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."); *see also Berben v. State*, 268 So. 3d 235, 239 (Fla. 5th DCA 2019) (Grosshans, J., dissenting) ("As an appellate court, our role is not to act as counsel for a party by raising issues that were not briefed."); *see generally United States v. Sineneng-Smith*, 590 U.S. 371, 379–80 (2020) (discussing party presentation principles and holding unanimously that the Ninth Circuit's failure to address the party-presented controversy and, instead, "takeover" of the appeal by raising new issues, amounted to an abuse of discretion).

56

The en banc court has gone a bit too far by choosing to cast the party presentation principle aside and injecting unpreserved and unraised issues. Indeed, it has pursued and adopted legal theories the State conceded it did not raise in its answer brief. Moreover, it ignores crucial concessions and waivers by the State to reach its conclusions; the State conceded it didn't brief, and thereby, waived issues the en banc court nonetheless revives. The State admitted at oral argument that a Florida driver license contains government speech that is subject to the compelled speech test in *Wooley*. The State never claimed that the content of a Florida driver license is government speech beyond the reach of any judicial scrutiny, an issue raised for the first time during the panel's oral argument, which is too late in the process for injecting new legal issue. *See Powell v. State*, 120 So. 3d 577, 591 (Fla. 1st DCA 2013) (noting that courts generally do not consider issues raised for the first time at oral argument). The decision also relies on novel historical research neither party advocated, endorsed, or had a reasonable opportunity to evaluate (that includes judges of the court, who first saw it in the internal en banc review process). The circumstances of this case do not justify such a far-reaching departure from what the parties presented. *See Sineneng-Smith*, 590 U.S. at 379 ("No extraordinary circumstances justified the panel's takeover of the appeal.").

A strict application of the party presentation principle is reflected by our sibling court in Tallahassee:

> An appellate court is not at liberty to address issues that were not raised by the parties. Nor may an appellate court depart from its dispassionate role and become an advocate by second guessing counsel and advancing for him theories and defenses which counsel either intentionally or unintentionally has chosen not to mention. Instead, an appellate court must confine its decision to the issues raised in the briefs.

*Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (citations and internal quotation marks omitted). It is noteworthy that this case—decided by the full court—markedly loosens this district's approach to the party presentation principle. From now on, we

judges can raise and adjudicate issues the parties did not raise; we can second-guess and advocate theories and defenses that counsel intentionally chose not to pursue; and we can go so far as to revivify claims affirmatively waived. We can blaze our own judicial path and decide unpreserved legal issues with novel jurisprudential approaches that are advanced for the first time on appeal by the Court itself.

Of course, a "court is not hidebound by the precise arguments of counsel" and room exists for reasonable judicial inquiry beyond what the parties present. *Sineneng-Smith*, 590 U.S. at 380. Briefing that supplements an appellate court's understanding of a case can be helpful, but parties ordinarily should not be subject to a limitless litany of potential issues a court advances on its own to support its holding. While the "party presentation principle is supple, not ironclad," *id.* at 376, when a case can be decided solely on the issue the parties chose to present—*as in this case*—a court majority should generally stick to the playbook and decide only that.[1]

In this regard, the en banc court could easily decide this case in a judicially modest approach on the issue and concessions the parties themselves presented. It could simply conclude that the SEXUAL PREDATOR designation is the least restrictive means of protecting the public, and leave it at that, which is all that the State seeks. Deciding whether the second part of the compelled speech test is met is the most challenging aspect of the issue the parties presented; judges of good faith can fall on either side of this question, as the Louisiana case demonstrates. Reconfiguring the case, and deciding issues not presented and using an analysis never before applied, seems unjustified when a more modest and minimal approach is available, i.e., the approach the parties actually presented.

---

[1] That said, doctrinal concurrences—which need not hew to party presentation principles—provide a means for judicial ruminations on alternative theories in support of a lead opinion. *See* Ryan M. Moore, *I Concur! Do I Matter?: Developing A Framework for Determining the Precedential Influence of Concurring Opinions*, 84 Temp. L. Rev. 743, 766 (2012).

Turning to the merits, the en banc opinion leaves the impression that Crist's legal action seeks to erase his conviction and status as a sexual predator, which is not accurate. Crist is not attempting to excise his criminal history, claim innocence, or rewrite history. Indeed, Crist doesn't contest he is a sexual predator as defined under Florida law; *and he doesn't contest that the State has a compelling interest in having a designation on his driver license.* His *sole claim* is that the designation used, SEXUAL PREDATOR, is not the least restrictive manner of conveying this information on his driver license. That is the *only issue* the parties litigated below and presented on appeal. As mentioned previously, the State commendably conceded the narrowness of the issue presented and that it was not contesting on appeal the applicability of the compelled speech test; its only argument was that it met the test's second prong, i.e., that the designation was the least restrictive means.

In this regard, the unpublished, uncited, and easily distinguishable federal district court passport case, i.e., *Doe v. Kerry*, No. 16-cv-0654-PJH, 2016 WL 5339804, at *1 (N.D. Cal. Sept. 23, 2016), misses the mark. No party cited the case, which involved a challenge to a federal passport identifier for sexual offenders. *Id*. More importantly, the case was decided on *ripeness* grounds, *id*. at *15, making its discussion of the compelled speech doctrine gratis dicta, meaning a judicial statement of "a legal principle more broadly than is necessary to decide the case," Bryan A. Garner et al., *The Law of Judicial Precedent* 792 (2016). In other words, the case didn't even get out of the starting gate. That's because (a) the federal government had not even developed what the "passport identifier" would be; and (b) the requisite governmental agency process was incomplete. *Id*. at *11. As the district court noted, the "passport identifier provisions of the [federal statute] are *not yet in effect*, and *it is not clear who would be subject to the passport identifier provision, what form the identifier would take, or how it would be employed*." *Id*. at *14 (emphasis added). Because there was "no final agency action, and no regulations or guidance, and it is not yet known what form the identifier provision will take or how it will be implemented . . . the issues are not yet fit for judicial decision." *Id*. at *13. Reliance on a case in which an important constitutional claim wasn't even ready for adjudication is to be avoided.

59

Moreover, the Supreme Court of Louisiana, in *State v. Hill*, 341 So. 3d 539 (La. 2020), effectively distinguished *Kerry*, which made a distinction between compelled facts and compelled opinions, a distinction the Supreme Court found irrelevant in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 797–98 (1988), holding that compelled statement of opinions and compelled statement of facts fall within First Amendment protections because "either form of compulsion burdens protected speech." The court in *Hill* noted:

> Thus, we find the attempt by the *Kerry* court to distinguish the facts of that case from the *Riley* jurisprudence unpersuasive, as *Riley* did not differentiate between statements of facts that relate to controversial or political facts, as opposed to simply facts. Like in *Wooley* where the government-issued license plate read "Live Free or Die," the identification card branded with "sex offender" is speech. The fact that a license plate was found to be government speech did not immunize it from a compelled speech analysis. Thus, even though an identification card is government speech, a compelled speech analysis may still be required. While *Wooley* involved an ideological statement, *Riley* observed that cases cannot be differentiated on whether they turn on compelled statements of opinion or on compelled statements of fact. Further, the First Amendment does not turn on whether a person is speaking or being forced to speak, rather than remaining silent. While no one can force the state to print a certain design on its license plate, like in *Walker*, neither can the state force someone to display a particular message on his or her license plate either, like in *Wooley*.

*Hill*, 341 So. 3d at 552. Plus, in *Kerry*, the plaintiffs were seeking to *prevent* the use of *any* type of designation on passports that would reflect a sexual offense conviction, *Kerry*, 2016 WL 5339804, at *9; indeed, the government had not yet even decided on what type of designation to use, *id*. at *13. In sharp contrast, Crist does not contest that the State of Florida may use a

designation on a driver license, only that the one chosen goes too far and violates the compelled speech doctrine. The *Kerry* case, thereby, is of little value.

Much like *Kerry*, reliance on the Eleventh Circuit's case in *Corbitt v. Secretary of the Alabama Law Enforcement Agency*, 115 F.4th 1335 (11th Cir. 2024), is a bit tenuous. In that case, the plaintiffs, "transgender residents of Alabama," sought "to change the sex on their driver's licenses without undergoing (what Alabama accepts as) sex-change surgery." *Id.* at 1340. Unlike some states, Alabama allows the sex designation on driver licenses to be changed if the license holders undergo "gender reassignment surgery" and submit the requisite documentation. *Id.* Submission of an amended birth certificate was also acceptable. *Id.* at 1346.

The plaintiffs in *Corbitt*, however, elected to not have transgender surgery and, instead, asserted a constitutional right to contest the default mechanism, which used their original birth certificates. *Id.* at 1343. On those limited facts, the Eleventh Circuit held that the plaintiffs' claims involved no compelled speech and were subject to only rational basis review. *Id.* at 1347–50. The Eleventh Circuit's analysis, however, failed to consider the most relevant case, *Wooley*, in its analysis. The license tag in *Wooley* was government speech, but the Supreme Court applied compelled speech analysis. The same should be true of a Florida driver license; it contains government speech but is still subject to constitutional scrutiny. That's because the "Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Walker v. Tex. Div., Sons of Confederate Vets., Inc.*, 576 U.S. 200, 208 (2015). *Corbitt* thereby appears to have missed the mark by totally ignoring *Wooley*.

Finally, the en banc opinion takes a bit of a jurisprudential gamble. Rather than address and decide the narrow issue that the parties presented, it takes on the heavier task of reading tea leaves to divine if the Supreme Court might modify its compelled speech jurisprudence, in this case as it applies to state driver licenses that contain sexual offender designations.

61

But the Supreme Court recently denied review without comment in *Hill*, a nearly identical case from Louisiana involving *Wooley*'s application to a sexual offender license designation. In that case, the state supreme court struck down the Louisiana law in October 2020. *See Hill*, 341 So. 3d at 555. Louisiana filed a certiorari petition in the Supreme Court on May 10, 2021, which was supported by an amici brief of ten other states (which typically increases the likelihood of review). Petition for A Writ of Certiorari, *Louisiana v. Hill*, (No. 20-1587), 2021 WL 1966520 (May 10, 2021); *see also* Brief of Oklahoma et al. as Amici Curiae in Support of Petitioner, *Louisiana v. Hill*, (No. 20-1587), 2021 WL 2458642 (June 14, 2021). The state supreme court denied the state's request for a stay and Justice Alito, notably, did so as well. *Louisiana v. Hill*, 141 S. Ct. 1232 (2020). The questions presented were:

> (1) May a State require convicted sex offenders to obtain and carry a state identification bearing the words "sex offender" without facially violating the First Amendment's prohibition on compelled speech?

> (2) Does a convicted sex offender have a First Amendment right not to be prosecuted for fraudulently altering a state identification card after scratching off a statutorily required sex-offender designation?

Petition for Writ of Certiorari, *Louisiana*, (No. 20-1587) 2021 WL 1966520. These are the same questions raised in this case, yet the Supreme Court denied review on October 4, 2021, without any dissent, commentary, or suggestion that the Louisiana Supreme Court had erred. *Louisiana v. Hill*, 142 S. Ct. 311 (2021). Denial of review is not an adjudication on the merits; the fact the Supreme Court had the opportunity to review the same issues as this case, including *Wooley*'s application, but chose to take a pass, suggests the analysis in *Hill* and related cases didn't ruffle any judicial feathers. It was yet another reason why the panel majority chose to follow existing precedents, albeit not binding but persuasive, given the Supreme Court's denial of review in *Hill*.

The en banc court strays on the merits by deciding issues the Court, and not the parties, raised on its own, devoting many pages to the unraised compelled speech issue in concluding that Florida driver licenses are government speech, immune from judicial scrutiny. In doing so, it ignores the parties' briefs and concessions. The Supreme Court has clearly said that compelled government speech is subject to constitutional limitations under the Free Speech clause. The en banc opinion errs in holding otherwise and that *Wooley*—the United States Supreme Court's license plate case—plays no role in a driver license case. *Wooley* is the closest analogue in deciding this case and clearly favors Crist's position as the Louisiana Supreme Court and Alabama federal court concluded in applying *Wooley*. Regardless of the outcome in this case, the Court should limit its analysis to only the issue the parties present.[2] On the merits, the best course is to do what the panel majority did: decide the issue the parties presented, stay its decision, and let a higher authority definitively resolve this important case.

That said, the en banc opinion correctly holds that jurisdiction exists because Crist adequately preserved his constitutional challenge, which is dispositive for purposes of appellate review. It is also partially correct in determining that a Florida driver license contains portions that are government speech (such as the SEXUAL PREDATOR designation). As discussed below, a Florida driver license has features that are

---

[2] Beyond this case, a worrisome trend for traditional judicial conservatives is appellate courts commandeering a case by raising and deciding issues the parties did not raise, even inviting new amici and adding new intervening parties to an appeal to brief the newly spawned issues. *See, e.g., Doe v. Uthmeier,* No. 5D2025-1363, 2025 WL 1386707 (Fla. 5th DCA May 14, 2025) (sua sponte raising issues beyond those presented and inviting the attorney general, but not other interested organizations, to participate as amicus). This pattern is precisely what the United States Supreme Court unanimously denounced recently in *United States v. Sineneng-Smith,* 590 U.S. 371, 372 (2020) (concluding that practices that "takeover" an appellate case are an abuse of appellate discretion).

purely personal speech (such as "organ donor," "Veteran," and "Deaf") that are included solely at the option of the license holder; as such, Florida driver licenses are a speech hybrid. What follows is the panel's majority opinion, now a dissent, on the merits of the issue the parties themselves presented.

*Dissenting Opinion on the Merits*

At issue are governmentally compelled designations on the front of Florida driver licenses and ID cards of people convicted of sexual crimes. Here is an exemplar from the website of the Florida Department of Highway Safety and Motor Vehicles:



The Department explains that the "Florida driver license and ID card allows for the identification of sexual predators and sexual offenders with a blue identifier on the bottom right of the front of the card. Sexual predators will have '**Sexual Predator**' spelled out on the card, while sexual offenders have '**943.0435, F.S.**' listed in this area." *See Florida's NEW Driver License and ID Card*, Florida Highway Safety and Motor Vehicles, https://www.flhsmv.gov/driver-licenses-id-cards/newdl/ (last visited June 7, 2024).[3] This case involves the "SEXUAL

---

[3] Because this case involves a Florida driver license, rather than a Florida ID card, references to the former will generally

PREDATOR" designation, not the sexual offender designation; the latter—as indicated—uses only the number of the sexual offender statute, "section 943.0435," rather than a phrase such as "SEXUAL OFFENDER," or the like. In general, sexual predators are sexual offenders who have committed two or more sexual offenses, who used physical violence in such offenses, or who preyed on children. § 775.21(3)(a), Fla. Stat. (2024).

In 2001, at the age of 26, Michael Crist, attempted to engage in unlawful conduct with a minor under the age of 12. In 2002, he pled no contest to violations of section 794.011(3), Florida Statutes, (attempted sexual battery on a child under the age of 12), and section 800.04(5)(a) & (b), Florida Statutes, (lewd and lascivious molestation), resulting in eight years in prison and seventeen years of supervision. He was released from custody in May 2008 and thereafter resided in Sumter County.

Over a decade later, a probation officer went to Crist's home to conduct a sexual predator registration check; Crist had no prior supervisory violations at that time. The officer asked for Crist's driver license but snatched it away when Crist appeared to be scratching off a sticker (a Happy Face emoji) placed over the SEXUAL PREDATOR designation. Crist was charged with possession of a driver license without the required designation and for tampering with evidence (by attempting to scratch off the sticker).

Crist moved to have the statutes requiring the SEXUAL PREDATOR designation (sections 322.212(5)(c) and 322.141 (3)(a), Florida Statutes) declared unconstitutional as applied to him. He relied on recent cases from the Louisiana Supreme Court and a federal district court in Alabama, each holding that similar designations amounted to compelled speech in violation of the license holder's constitutional rights under the First Amendment. The trial court, however, held that (a) Crist failed to provide any Florida caselaw that the sexual predator designation on Crist's

---

include the latter for convenience. In addition, references will be to a "driver license," the phrase used in Florida Statutes, rather than the colloquial "driver's license." *See* § 322.01(18), Fla. Stat. (2024).

license was compelled speech and (b) the designation "is less intrusive and less restrictive than any alternative that would still meet the compelling interest of public notification." Crist appeals the denial of his motion.

I.

Florida has a compelling governmental interest in protecting the public from persons who have been convicted of offenses deemed sexual predation. That's because the legislature has declared that sexual predators "present an extreme threat to the public safety" and "are extremely likely to use physical violence and to repeat their offenses." § 775.21(3)(a), Fla. Stat. Indeed, the legislature has said that Florida "has a compelling interest in protecting the public from sexual predators and in protecting children from predatory sexual activity, and there is sufficient justification for requiring sexual predators to register and for requiring community and public notification of the presence of sexual predators." *Id.* § 775.21(3)(c).

Because of the "high level of threat that a sexual predator presents to the public safety, and the long-term effects suffered by victims of sex offenses," the State has sufficient "justification to implement a strategy that includes":

> 3. Requiring the registration of sexual predators, with a requirement that complete and accurate information be maintained and accessible for use by law enforcement authorities, communities, and the public.
>
> 4. Providing for community and public notification concerning the presence of sexual predators.

*Id.* § 775.21(3)(b)3. & 4. Pursuant to legislative directive, Florida has online registration and notification systems. Sexual offenders and sexual predators are required to register and provide detailed information on a real-time basis such as address, phone number, internet identifiers, autos, and in-state travel. Their photos and personal information (race, sex, hair color, eye color, height, weight) are posted for identification. A link on the site produces printable flyers with a registrant's photo, background,

66

offenses and even a QR code (specific to each registrant) for posting. Florida provides online search engines for locating sexual offenders and sexual predators that generate maps so the public can see if such individuals live in their neighborhoods. The system also has a notification/tracking feature that allows members of the public to receive an email whenever a sexual offender or sexual predator moves close to an address in Florida, which could be a home, workplace, school, daycare, and so on.

This case does not directly involve the registration and notification systems or the search engines that are available for law enforcement and the public to identify, locate, and receive notifications about sexual offenders and predators. As a general matter, these systems are deemed constitutional with minimal judicial scrutiny because they have a rational basis. *See, e.g., Doe v. Moore*, 410 F.3d 1337, 1344–48 (11th Cir. 2005) (finding that the registration and notification requirements under the Sex Offender Act do not infringe on sex offenders' substantive due process rights because it is "rationally related to a legitimate government interest"); *United States v. Ambert*, 561 F.3d 1202, 1209–10 (11th Cir. 2009) (finding *Moore*'s substantive due process analysis applicable where "[t]he same putative 'right' of a sexual offender to refuse to register and to prevent publication is at issue in this case under a similar national registration statute, and the restrictions contained in the federal statute, similarly, are rationally related to Congress' legitimate goal in protecting the public from recidivist sex offenders"); *see also Butler v. State*, 923 So. 2d 566, 569 (Fla. 4th DCA 2006) (analyzing *Moore*). Though these systems are generally valid and not under scrutiny in this case, they are relevant in analyzing the legal issue presented: whether the designation of "SEXUAL PREDATOR" on a Florida driver license violates constitutional principles as a form of compelled speech by the license holder that is not narrowly tailored under the applicable strict scrutiny test, given the registration and notification systems just described.

A. Florida Driver Licenses and Compelled Speech.

The first step is determining the nature of a Florida driver license. Is it a governmentally controlled forum containing government speech, private speech, or a hybrid of the two? The

67

State candidly and justifiably concedes that it has not argued that the SEXUAL PREDATOR designation on a Florida driver license is purely government speech subject to little or no judicial scrutiny. Nor could it.

On its face, a Florida driver license is a conglomeration of government and personal speech, some of it compelled by law to be on the front of the license (such as the "Sexual Predator" designation) and some of it voluntarily placed there (such as the "Organ Donor," "Veteran," "Deaf" and "Developmentally Disabled" designations). The back of the card has additional voluntary designations for holders of Lifetime Florida Wildlife Commission freshwater fishing, hunting, saltwater fishing, and sportsman licenses, among others; symbols such as a bass, deer, sailfish, and rifle/rod are used. Florida driver licenses are essentially speech hybrids.

With its mixture of information, images, and symbols, a Florida driver license cannot be seen as simply a plastic card containing *only* government speech. That's because several of its features are private or personal information that license holders want to convey to others. Plus, most of the governmentally required information, such as address, date of birth, sex, height, and sexual crimes, is not purely governmental; it is factual information about the license holder that is personal only to him individually. Some people don't like certain facts about themselves to be known, such as their confidential home addresses (e.g., police officers, public officials, etc.) or their age (for vanity or other reasons), their sex presented in a binary mode (a contemporary matter of controversy), or that they are a certain height. In short, a Florida driver license is not purely a governmentally controlled forum with only governmentally approved viewpoints or speech; it is a hybrid of government and private speech.

Even if it were purely government speech it would still be subject to constitutional analysis under the compelled speech doctrine when the governmental message is placed on a license tag, a driver license, or any other item that is readily associated with an individual. The Supreme Court directly addressed this point, stating the "Free Speech Clause itself may constrain the

68

government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Walker v. Tex. Div., Sons of Confederate Vets., Inc.*, 576 U.S. 200, 208 (2015); *see Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) ("But the fact that a license is government speech does not mean it is immune from the compelled speech analysis."); *see also State v. Hill*, 341 So. 3d 539, 552 (La. 2020) ("Thus, even though an identification card is government speech, a compelled speech analysis may still be required."). Here, the governmental message is "I, as the holder of this license, am a sexual predator."

Next is the question of whether the sexual predator designation is "compelled speech." As just mentioned, a Florida driver license is not immunized from the compelled speech doctrine simply because it is governmentally controlled and contains some governmentally approved information. The State concedes that even if a Florida driver license was considered government speech, it would still be subject to judicial review as compelled speech.

Indeed, the license plate in *Wooley v. Maynard*, was governmentally controlled and contained an ideological expression ("Live Free or Die") that the government supported, but that didn't stop the United States Supreme Court from concluding that Wooley, who disagreed with the slogan, had a constitutional right not to display it. 430 U.S. 705, 716–17 (1977). Government speech is a different animal from compelled speech. The former focuses on the government's interest in expressing *its own views* without compelling a private person to communicate information or a message he does not wish to convey; the latter involves the government *compelling* a person to do so.

The test for compelled speech, applied here, is whether the SEXUAL PREDATOR designation communicates information compelled by the government that is readily linked or associated with the plaintiff. *See Cressman v. Thompson*, 798 F.3d 938, 949–51 (10th Cir. 2015); *see generally Wooley*, 430 U.S. at 714–17. This test is easily met. The designation is compelled by the government over Crist's objection, and the designation is *directly* associated with Crist: it is a designation on a driver license that

is personal to him alone. *See Doe 1*, 367 F. Supp. 3d at 1326 ("Identification cards, by contrast, are personalized. They are meant to convey substantive personal information about their holders. They are meant to be displayed, never to be given away.").

By compelling that the designation be on Crist's license, the State is directly conveying that information through Crist, who must have his driver license in his possession 24/7. He is required to present it upon demand at any time or place. It is universally understood to be *his* driver license, one that he must present in myriads of daily transactions with businesses, government offices, and others that require personal identification. He paid for it, he must possess it, and he has a due process right in retaining the privilege of using it. The question is not who owns or has a property interest in a driver license, but whether it is readily linked or associated with its holder; here, that is clearly Crist. His driver license is not a duly issued official state document in a government filing cabinet (or computer file) or posted on a government website. It is governmentally regulated, but that does not diminish the fact that the license is personal and readily identifiable as Crist's personal license with information related directly to him. *See Doe 1*, 367 F. Supp. 3d at 1326; *Mariach v. Spears*, 570 U.S. 48, 57 (2013) ("To obtain a driver's license . . . state DMVs, as a general rule, require an individual to disclose detailed personal information, including name, home address, telephone number, Social Security number, and medical information."). In short, it is *Crist's* identity on the card, not that of the government; no reasonable observer would conclude it is the *government's* identity that is featured on Crist's driver license.

Plus, the State's ability to take away a driver license under certain circumstances does not give the government the unreviewable right to place any message or information it wants on it and force persons to convey that message or information to others. Just like a driver license, a Florida license plate is subject to forfeiture, but as in *Wooley* the government cannot compel a message on it. Government regulation of driver licenses likewise does not give the government the right to compel whatever message the government desires. Just because the government

70

regulates—or even owns—lapel buttons or t-shirts emblazoned with SEXUAL PREDATOR doesn't mean it can force individuals such as Crist to wear them at all times and all places; nor could it force the expression of political viewpoints ("Vote Democratic!") or causes ("Build the Wall!"). As the Supreme Court has reminded us, the "Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Walker*, 576 U.S. at 208.

Furthermore, a driver license is readily viewable to a broad swath of members of the public who require it for transacting business and other essential activities. It is not like a road-side billboard or a car's license plate, both of which are in public spaces and visible to members of the public generally. But both do not directly or necessarily convey information about a specific person or who even owns them. The license tag in *Wooley*, for example, was on Wooley's car, but observers would not necessarily know who owned the car. In sharp contrast, a Florida driver license is a privately possessed card that displays compulsory information that is directly personal to the license-holder and thereby readily associated with the individual person whose face and name are on it. As the court in *Hill* stated, "[e]ven more so than a license plate on a car, an identification card is personalized to such an extent that it is readily associated with the bearer." *Hill*, 341 So. 3d at 549.

A Florida driver license is a forum in which a license holder, who has been convicted of a sexual offense, is compelled to disclose the *fact* of his criminal history against his wishes. That a fact is compelled rather than a political opinion or policy doesn't matter. The Supreme Court has made clear that the compelled speech doctrine applies whether the government compels political speech *or facts*. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988) (stating that its precedents "cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech").

As both the Louisiana Supreme Court and the Alabama federal district courts have concluded, a compelled disclosure

emblazoned on a driver license is a form of compelled speech subject to constitutional limitations. Indeed, the Alabama federal court recently concluded that an identification card with a sexual offender designation is compelled speech.

> This is so for the same reasons that the court previously found the "CRIMINAL SEX OFFENDER" ID label compelled speech. *See Doe 1*, 367 F. Supp. 3d at 1323–27 (explaining why an ID label requirement attached to a certain group of people constitutes compelled speech). Contrary to Defendant's assertions, the challenged provision does not simply require sex offenders to "maintain and possess an ID;" it requires the ID to bear a specific, expressive message. Indeed, the explicit purpose of the provision is to express a class-based message. Like a license plate that says, "Live Free or Die," *Wooley*, 430 U.S. at 714, 97 S.Ct. 1428, or a yard sign that warns away citizens from a sex offender's home, *McClendon v. Long*, 22 F.4th 1330, 1333 (11th Cir. 2022), a required message classifying someone as a sex offender on their personal ID constitutes compelled speech.

*McGuire v. Marshall*, No. 2:19-CV-174-WKW, 2024 WL 2401833, at *60 (M.D. Ala. May 23, 2024) (citation and footnote omitted). Similarly, requiring a message declaring a person is a SEXUAL PREDATOR on his personal driver license constitutes compelled speech, which may be constitutional if it meets the applicable judicial test.

## B. The Judicial Test

The final step is applying the proper judicial test to assess whether the means used to advance the government's compelling interest in protecting the public from recidivism by sexual predators is permissible under free speech precedent. The few cases that discuss the proper test in the context of sexual offenders/driver licenses apply the most difficult test, that of

72

strict scrutiny. *See, e.g.*, *Hill*, 341 So. 3d at 545; *Doe 1*, 367 F. Supp. 3d at 1326.[4]

They do so in part based on the Supreme Court's decision in *Wooley*, which held that New Hampshire could not punish Mr. Wooley for covering up the state motto, "Live Free or Die," on his state-issued license plate. The rationale in *Wooley* was that even when a state's purpose in compelling a message on a vehicle's license plate is "legitimate and substantial," that "purpose cannot be pursued by means that broadly stifle fundamental personal liberties *when the end can be more narrowly achieved*. The breadth of legislative abridgement must be viewed in the light of *less drastic means for achieving the same basic purpose*." 430 U.S. at 716 (citation omitted) (emphases added). The highlighted language emphasizes the narrowness of the state's choices when it chooses to compel a person to convey information that they do not wish to express or associate with.

---

[4] An anomaly identified in *Hill* is that polar opposite tests apply depending on how a "branded-identification card" is characterized, i.e., whether it "amounts to government speech or compelled speech." *Hill*, 341 So. 3d at 545. "If *compelled speech*, the branded identification card faces *strict scrutiny*. If *government speech*, the branded identification card faces *little to no scrutiny*." *Id*. (emphases added). We note that the Supreme Court in recent years has softened the judicial test for content-based regulations in limited situations, but not yet in the compelled speech context. *See, e.g., Vidal v. Elster*, 602 U.S. 286, 300 (2024) ("Because of the uniquely content-based nature of trademark regulation and the longstanding coexistence of trademark regulation with the First Amendment, we need not evaluate a solely content-based restriction on trademark registration under heightened scrutiny."); *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 190 (2007) (noting that content-based regulations of speech are presumptively unconstitutional, but that in the "unique context of public-sector agency-shop arrangements, the content-based nature of [the statute at issue] does not violate the First Amendment"). Whether it or our supreme court decides to do so is their prerogative alone.

The Alabama and Louisiana cases also point to the multitude of Supreme Court precedents holding that a content-based restriction on speech must pass strict scrutiny, meaning that the state "must have a compelling interest, and it must have adopted the least restrictive means of achieving that interest." *Doe 1*, 367 F. Supp. 3d at 1326 (citing *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015) (stating that content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests")); *see also Hill*, 341 So. 3d at 553 ("The branded identification card is compelled speech, and it is a content-based regulation of speech that consequently must pass strict scrutiny.").

Both courts concluded that requiring the display of "sexual offender" or the like on an individual's state-issued identification card is not the least restrictive way of advancing the state's interest. In *Hill*, the court concluded as follows:

> The branded identification card is compelled speech, and it is a content-based regulation of speech that consequently must pass strict scrutiny. While the state certainly has a compelling interest in protecting the public and enabling law enforcement to identify a person as a sex offender, Louisiana has not adopted the least restrictive means of doing so. A symbol, code, or a letter designation would inform law enforcement that they are dealing with a sex offender and thereby reduce the unnecessary disclosure to others during everyday tasks. The sex offender registry and notification is available to those who have a need to seek out that information, while also not unnecessarily requiring disclosing that information to others via a branded identification. As Louisiana has not used the least restrictive means of advancing its otherwise compelling interest, the branded identification requirement is unconstitutional.

*Hill*, 341 So. 3d at 553. Likewise, in *Doe 1*, the court concluded that:

74

> The State has a compelling interest in enabling law enforcement to identify a person as a sex offender. But Alabama has not adopted the least restrictive means of achieving that interest. By using "CRIMINAL SEX OFFENDER" instead of a single letter, the State goes beyond what is necessary to achieve its asserted interest.

*Doe 1*, 367 F. Supp. 3d at 1326 (internal citation omitted). The court noted that Alabama conceded that it "could use a single letter to designate sex offenders" and that "law enforcement officers would know what that single letter meant." *Id.* at 1326–27. As such, "using one letter would keep officers informed while reducing the unnecessary disclosure of information to others." *Id.* at 1327 (footnote omitted). Notably, Alabama's legislature responded to *Doe 1* by dispensing with the CRIMINAL SEX OFFENDER designation on identification cards in favor of the "code 'CV606' in small black font," which was upheld as constitutional. *McGuire*, 2024 WL 2401833, at *60.

Both courts focused on the law enforcement's need to identify sexual offenders via a symbol, code, or letter on the identification card. The court in *Hill* also highlighted that a state-compelled sex offender registry and notification system was publicly available "to those who have a need to seek out that information, while also not unnecessarily requiring disclosing that information to others via a branded identification." *Hill*, 341 So. 3d at 553.

The reasoning of both the Louisiana Supreme Court and the Alabama federal court are persuasive and support the conclusion that the SEXUAL PREDATOR designation is not narrowly tailored or the least restrictive means, thereby failing strict scrutiny. As a content-based restriction, the designation is presumptively unconstitutional, requiring that the "government proves that [the restriction is] narrowly tailored to serve compelling state interests." *Reed,* 576 U.S. at 163. Unlike legislation generally, which is presumed constitutional, the restriction at issue is presumed to be unconstitutional because it forces an individual to convey governmentally compelled information over his objection. It does not mean the government

automatically loses, only that it must prove that its restriction is narrowly tailored and no broader than necessary.

Here, the State relies on the statutory language of the legislature's purpose for a registration and notification system of sexual offenders and sexual predators. The legislature identified two goals: registration and notification, both of which are substantially advanced by Florida's comprehensive registration and notification systems, by which the public can freely obtain information and emails about sexual offenders and predators who live in or move into their neighborhoods. The State clearly advances its compelling interest through these systems, which meet constitutional standards by disseminating information broadly *without compelling speech* by individual registrants.

The question, however, is whether—given the robust registration and notification systems in place for use by the general public and law enforcement—the State has proven it has no less intrusive means and must necessarily use the SEXUAL PREDATOR designation on driver licenses rather than use a code or statute number as it does for sexual offenders. Existing precedent, though limited, holds that the use of a code or number is constitutional under compelled speech analysis because they provide information to persons *with a need to know it*; it is narrowly tailored in that sense. Persons needing to screen for sexual predators can ask to see a driver license and determine if it has the code/number. The court in *Doe 1* pointed out that the "general public most likely would not know what that single letter meant" thereby reducing the potential for overbroad disclosures of compelled speech. *Doe 1*, 367 F. Supp. 3d at 1327. In other words, compelled use of the SEXUAL PREDATOR designation to the world at large is overbroad if a more narrow and functional means of communication is available.

The point of strict scrutiny is that the government must carefully tailor a compelled speech policy that is no broader than necessary to advance its interest in protecting the public. In this regard, not every situation calls for the compelled public disclosure that an individual has previously committed a sex crime. A requirement that a registrant publicly wear a governmentally compelled tee shirt or badge saying SEXUAL

76

PREDATOR would be highly effective in notifying the public about the person's past sexual criminality; but it is doubtful such a requirement would be narrowly tailored to pass constitutional analysis. The same would be true of tee shirts or badges saying FELON, STALKER, MURDERER, and so on for those released into society but who may have committed crimes with elevated risks of recidivism. In a similar way, the SEXUAL PREDATOR designation on driver licenses is not a narrowly tailored means to inform only those persons who have the greater need to know about an individual's past sexual criminality.

The conclusion that the "SEXUAL PREDATOR" designation on Crist's driver license is impermissibly compelled speech under the prevailing judicial test in no way involves the use of judicial power to compel a specific change to the statutory law. It merely holds that this specific designation is off-limits under the Bill of Rights enacted by and for the People; no judicially compelled change of law is made. Whether the government chooses to use a particular number, symbol, color, or font size in place of the current designation is not something a court directs or involves itself in. The State might choose to use statute numbers but use red for sexual predators and blue for sexual offenders; it might use symbols that the public readily understands; it might choose to issue separate free-standing sexual offender identification cards that sexual offenders and sexual predators must present when asked. These are decisions for the legislative and executive branches, not the judicial branch.

II.

Florida laudably has rigorous registration and notification systems designed to closely monitor sexual offenders and sexual predators. The systems inform the public and law enforcement about the location and backgrounds of sexual offenders and sexual predators, which includes notifications to the public and institutions such as schools and churches when sexual offenders and predators reside in their neighborhoods. The designation of SEXUAL PREDATOR on a personal driver license, however, is the type of compelled speech that is a step too far as the Louisiana Supreme Court and an Alabama federal court have held. The availability of numbers, symbols, or codes in various

colors and fonts, as an example, shows a lack of narrow tailoring and that the government's compelling interest in protecting the public can be achieved without compelling speech impermissibly. We emphasize that our decision is based on the existing United States Supreme Court and lower court precedents on compelled speech analysis and not out of sympathy for those who have committed the underlying crimes for which they have served their punishment. Because this issue is one of great public importance, the following question should be certified for the Florida Supreme Court's consideration:

> Does the requirement that a Florida driver license contain the designation SEXUAL PREDATOR for those persons within that category constitute compelled speech that is unconstitutional under the strict scrutiny test?

Because of the importance and unsettled nature of the issue, we would withhold issuance of the mandate and stay our decision, holding it in abeyance to allow for Florida Supreme Court review.

WALLIS, J., concurs.